**UNITED STATES of America, Appellee,**

v.

**Luis SOTOMAYOR, a/k/a "Toti," Carmen Iris Rivera, a/k/a "Carmencita," Jose Miguel Crespo, a/k/a "Mike Crespo," Victor Hernandez, a/k/a "Victor," a/k/a "Vitin," Steven Angelet, a/k/a "Steven Marcano," a/k/a "Stevie," and Ismael Romero, a/k/a "Cookie," Appellants.**

Nos. 1031—1036, Dockets 78–1064, 78–1073, 78–1076 to 78–1078 and 78–1086.

United States Court of Appeals, Second Circuit.

Argued June 1, 1978.

Decided Feb. 2, 1979.

William C. Pelster, New York City, for appellant Luis Sotomayor.

J. Jeffrey Weisenfeld, New York City (Steven M. Jaeger, New York City, on brief), for appellant Jose Miguel Crispo.

Robert B. Blossner, New York City, for appellant Steven Angelet.

Samuel W. Murphy, Jr., David S. Versfelt, New York City (Donovan, Leisure, Newton & Irvine, New York City, on brief), for appellant Ismael Romero.

Stephen M. Goldenberg, New York City, for appellant Victor Hernandez.

Michael Young, New York City (Goldberger, Feldman & Dubin, New York City, on brief), for appellant Carmen Rivera.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City (Robert J. Costello, Richard Lawler, Robert J. Jossen, Asst. U. S. Attys., S. D. N. Y., New York City, of counsel), for the U. S.

Before MANSFIELD and TIMBERS, Circuit Judges, and HOFFMAN,* Senior District Judge.

---

* Of the United States District Court for the Eastern District of Virginia, sitting by designation.

1. Appellants were sentenced as follows: Luis Sotomayor, twelve years imprisonment, with ten years special parole; Carmen Iris Rivera, ten years with ten years special parole; Jose Miguel Crespo, ten years with three years special parole; Victor Hernandez, six years with three years special parole; Steven Angelet, ten years with three years special parole; Ismael Romero, five years on the conspiracy county and a concurrent three years on the substantive count, with four years special parole.

In addition, Sotomayor and Rivera were later sentenced to six-month concurrent sentences after pleading guilty to assaulting a deputy United States marshal during the course of trial.

**WALTER E. HOFFMAN, Senior District Judge:**

Appellants appeal from judgments of conviction entered on January 26 and February 8, 1978 in the United States District Court for the Southern District of New York, after an eight week trial before the Honorable Lawrence W. Pierce, District Judge, and a jury. The appellants were convicted of conspiracy to import cocaine into the United States and to possess and distribute heroin and cocaine in the United States in violation of 21 U.S.C. §§ 846 and 963. In addition, Ismael Romero was convicted of possession with intent to distribute and distribution of 106.3 grams of heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(a).[1] The principal error alleged is the failure of the district court to suppress wiretap tapes allegedly untimely sealed under New York law. We affirm.

The Government's prosecution was mainly based on the introduction into evidence of 138 recorded conversations seized as a result of New York State court-ordered surveillance of four telephone lines in Bronx and Westchester Counties. Testimony was also given by officers who performed surveillance, and who explained to the court and jury the code system employed to discuss drug dealing over the telephone system.

Sotomayor's appeal is no longer before us. He escaped from the penal institution on or about July 10, 1978. On August 30, 1978 the panel entered an order dismissing Sotomayor's appeal with prejudice unless he returned to federal custody within 30 days of the filing of said order, same being under the authority of *Molinaro v. New Jersey*, 396 U.S. 365, 90 S.Ct. 498, 24 L.Ed.2d 586 (1970), and *United States v. Sperling*, 506 F.2d 1323, 1345, n. 33 (2d Cir. 1974). Sotomayor was not returned to federal custody within the required period and the dismissal of his appeal is now final. While Sotomayor is no longer a party to the appeal, this opinion would apply to him if he had remained a party.

Four plants or taps were involved, each operated by New York law enforcement officers. The following table outlines these taps:

| Plant/Tap | Telephone Line | Residence | Time Period (Sealing) |
|---|---|---|---|
| 22 | (212) 829–1770 | Gregory Comulada and Eva Ramirez | 9/22/76 (extensions 10/22/76, 11/5/76) to 12/2/76. Sealed 12/2/76. |
| 25 | (212) 796–9306 | Steven Angelet and Maria Marcano | 10/18/76 to 11/16/76. Sealed 11/17/76. |
| 28 | (914) 965–9624 | Jose Miguel (or Mike) Crespo and Julianna Gross | 11/23/76 (extensions 12/3/76, 12/23/76) to 1/10/77. Sealed 1/11/77. |
| 29 | (212) 681–1615 | Herman Rivera | 12/11/76 to 12/28/76. Sealed 12/29/76. |

The investigation which led to the indictment was commenced during the summer of 1976 by members of the New York City Police Department assigned to Manhattan North narcotics in conjunction with the Bronx County District Attorney. During the course of the investigation, the indicated wiretap orders were sought by New York law enforcement officers. These orders were granted by a justice of the Supreme Court of the State of New York, Bronx County, and by a judge of the Westchester County Court.

A central plant was established by the investigators to record and log the intercepted communications. The procedure for collection and preservation of the original tapes was to remove the tape from the recorder at midnight and place it, and the line sheets, in an envelope, which was put into a wire basket on a desk at the central plant. Police Officer Connelly was responsible for transporting the tapes from the plant to the Bronx district attorney's office the following day. On several occasions other officers performed this duty when Connelly could not.

The envelope was taken to the wire room at the district attorney's office. The tape would then be reproduced and stored in this room, which was under the supervision of detectives Ryan and Campion. Connelly, or one of the other officers, would return to the plant with the duplicate recording. Only Ryan, Campion, and their commanding officer had access to the tapes in the district attorney's office once the tapes were received as the tapes were filed in the office and only these three individuals had keys to the room.

Officer Connelly, in his capacity as coordinator of the four taps, was also present at the sealing of each of the tapes. He took possession of the appropriate tapes from the district attorney's wire room and appeared before a judge with an assistant district attorney for the sealing procedure. The sealing dates were December 2, 1976 (Tap 22); November 16, 1976 (Tap 25); January 11, 1977 (Tap 28); December 29, 1976 (Tap 29). Stated otherwise, the sealing took place within one day following the last extension. Appellants do not contest the admissibility of evidence received during the last extension order, but challenge the admissibility of evidence received during the original orders and any extension orders save and except the final ones.

Once sealed, the boxes containing the tapes were kept in a vault room in the Bronx district attorney's office. On September 16, 1977, Detective Ryan, on state court orders, turned the sealed tapes over to Police Officer Palermo and Agent Mella of the Drug Enforcement Administration. The tapes were transferred to the United States Attorney for the Southern District of New York. On September 26, 1977, the tapes were unsealed in the presence of District Judge Pierce and defense counsel.

The Government sought to prove the existence of an elaborate narcotics conspiracy which was responsible for distributing large quantities of heroin and cocaine in New York. At the head of the organization

were Sotomayor and Carmen Iris Rivera, whose operation provided narcotics to the organization of Crespo and Victor Hernandez. Crespo and Hernandez, in turn, acted as wholesalers and distributed the narcotics to a partnership consisting of Steven Angelet and Gregory Comulada,[2] and also to Herman Rivera,[3] Ismael Romero, and Santiago Lopez.[4] This latter group of purchasers redistributed the narcotics to their customers. Among Herman Rivera's customers were Angel Rivera[5] and Robert Beck.[6] Angel Rivera also received narcotics from the Sotomayor-Carmen Rivera partnership. In addition, the Angelet-Comulada partnership had other sources of supply for cocaine in Florida.

The investigation proceeded basically in inverse order of levels of importance to the conspiracy. The first wiretap was on the telephone of Gregory Comulada. Through conversations intercepted during that wiretap it was determined that Comulada had a partner in the narcotics business, Steven Angelet. Other conversations intercepted on the Comulada wiretap showed that Comulada and Angelet were receiving heroin from Mike Crespo. A wiretap then was installed on Crespo's telephone and revealed that Crespo had a partner, Victor Hernandez. Additional conversations intercepted during that wiretap showed that Crespo and Hernandez were receiving narcotics from Luis Sotomayor and Carmen Rivera.

At trial, the Government proved the substantial narcotics conspiracy charged in the indictment through much the same way that the investigation had uncovered the loosely knit, but clearly connected, chain of supplier-wholesaler-distributors and pur-

chasers. The chronological wiretaps demonstrated the inverse hierarchy and brought the conspiracy from distributor to wholesaler to supplier over a short period of time in the fall of 1976 and January 1977. The evidence showed that these defendants discussed various narcotic transactions in code language over the telephone and that Crespo and Hernandez also employed a radio communication device or "beeper" to maintain constant communication with each other as well as with all of their customers. The scope and volume of defendants' activities was suggested by a ledger book which was seized pursuant to a search warrant from Angel Rivera's apartment. This ledger book demonstrated the positions of Sotomayor and Carmen Rivera as sources of supply.

In addition, Detective Mahone testified that Ismael Romero sold him 106.3 grams of heroin on December 3, 1976, and offered to sell quarter kilograms of heroin to him on a regular basis.

The Government concedes that if the tapes are inadmissible, a new trial must be granted.

## I. SEALING OF TAPES

■ The crux of this case lies in the tape sealing requirements of the New York statute and their possible application to a subsequently conducted federal prosecution. It was not until the state and local law enforcement officers had completed their investigation that a decision was made to permit federal prosecution.[7] As noted, on September 16, 1977, the tapes were transferred, pursuant to state court orders, to the federal authorities.

2. Comulada died before the indictment was returned. When the police learned he had died, the tap on his telephone was terminated.

3. At the time of this writing, Herman Rivera is a fugitive, as he was at the time of the trial.

4. Lopez is a fugitive, as he was at the time of trial.

5. Angel Rivera entered a pretrial guilty plea to the conspiracy count, and received a sentence of ten years with ten years special parole. However, Judge Pierce later granted a motion

to reduce Rivera's sentence and resentenced him to imprisonment for eight years with six years special parole.

6. Beck is a fugitive, as he was at time of trial.

7. The initial federal indictment was filed on June 6, 1977. A superseding indictment was returned on August 1, 1977. The appellants went to trial on a second superseding indictment filed September 30, 1977. The last extension order for the final plant or tap expired on January 10, 1977.

In dealing with wiretap orders the federal statute, 18 U.S.C. § 2518(8)(a), provides: "Immediately upon the expiration of the period of the order, *or extensions thereof*, such recordings shall be made available to the judge issuing such order and sealed under his directions." (Emphasis added) The tapes were timely sealed following the expiration of the extension orders in accordance with the federal statute. No federal agents were involved in the wiretap investigation or in the sealing.

The New York counterpart to 18 U.S.C. § 2518(8)(a) is contained in Criminal Procedure Law (CPL) § 700.50(2) and requires the sealing of tapes "[i]mmediately upon the expiration of the period of an eavesdropping warrant."

Subsequent to the argument of this case on appeal, the New York Court of Appeals ruled that § 700.50(2) requires sealing at the expiration of each order authorizing eavesdropping, regardless of any extension of the period of authorized eavesdropping. *People v. Washington*, No. 505, 46 N.Y.2d 116, 412 N.Y.S.2d 854, 385 N.E.2d 593 (1978).[8] Although the Court of Appeals' discussion of the obligation to seal prior to the termination of the total period of authorized eavesdropping could be regarded as dictum, since the tapes in issue remained sealed for an unreasonable length of time following the expiration of the last extension period, we see no reason to doubt that *Washington* authoritatively declares New York law on this question. See *Hawks v. Hamill*, 288 U.S. 52, 53 S.Ct. 240, 77 L.Ed. 610 (1933). Accordingly, our discussion proceeds with the understanding that the tapes in this case were not sealed in compliance with New York law and would not be admissible in a state court proceeding.

We are next confronted with the question whether the admissibility into evidence of the taped wiretaps in a federal prosecution is governed by state or federal law. Manifestly, if federal law is applicable the tapes were clearly admissible. There is an impressive line of authority to the effect that, in the area of search and seizure, it is federal law which controls the admissibility of evidence in a federal trial, even where the evidence has been obtained by state officers who may have violated state law. *Preston v. United States*, 376 U.S. 364, 366, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); *Rios v. United States*, 364 U.S. 253, 255, 261, 80 S.Ct. 14–31, 4 L.Ed.2d 1688 (1960); *Elkins v. United States*, 364 U.S. 206, 223–24, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *United States v. Garrett*, 565 F.2d 1065, 1068 (9th Cir. 1977); *United States v. Turner*, 558 F.2d 46, 49 (2d Cir. 1977); *United States v. Mejias*, 552 F.2d 435, 444 (2d Cir. 1977); *United States v. Collins*, 552 F.2d 243, 247 (8th Cir. 1977), *cert. denied* 434 U.S. 870, 98 S.Ct. 214, 54 L.Ed.2d 149 (1977); *United States v. Magda*, 547 F.2d 756, 757, n.2 (2d Cir. 1976), *cert. denied* 434 U.S. 878, 98 S.Ct. 230, 54 L.Ed.2d 157 (1977); *United States v. Votteller*, 544 F.2d 1355, 1361 (6th Cir. 1976), *reh. denied* 554 F.2d 1065; *United States v. Dudek*, 530 F.2d 684, 690 (6th Cir. 1976); *United States v. Shaffer*, 520 F.2d 1369, 1372 (3rd Cir. 1975), *cert. denied* 423 U.S. 1051, 96 S.Ct. 779, 46 L.Ed.2d 640 (1976); *United States v. Bedford*, 519 F.2d 650, 654 (3rd Cir. 1975), *cert. denied* 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed.2d 323 (1976); *United States v. Burke*, 517 F.2d 377, 382 (2d Cir. 1975); *United States v. Armocida*, 515 F.2d 49, 52 (3rd Cir. 1975); *cert. denied sub nom. Gazal v. United States*, 423 U.S. 858, 96 S.Ct. 111, 46

---

8. *Washington* confirmed the reading of § 700.50(2) given by the Appellate Division, Second Department, of the New York Supreme Court. *People v. Glasser*, 58 A.D.2d 448, 396 N.Y.S.2d 422 (2d Dept. 1977); *People v. Weiss*, App.Div., 404 N.Y.S.2d 392 (2d Dept. 1978); see also *People v. Pecoraro*, 58 A.D.2d 462, 397 N.Y. S.2d 60 (2d Dept. 1977) (one judge disapproving and two judges approving of *Glasser's* interpretation of the statute). *Glasser* and *Pecoraro* were decided before the defendants in this

case went to trial but after the wiretapping took place. Prior to the decision in *Glasser*, but also after the completion of the wiretapping at issue in this case, this Court, having available only an unreported New York trial court decision, interpreted § 700.50(2) as being equivalent to the federal sealing requirements. 18 U.S.C. § 2518(8)(a). *United States v. Fury*, 554 F.2d 522 (2d Cir.), *cert. denied*, 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977).

L.Ed.2d 84 (1975); *United States v. Infelice*, 506 F.2d 1358, 1365 (7th Cir. 1974), *cert. denied* 419 U.S. 1107, 95 S.Ct. 778, 42 L.Ed.2d 802 (1975); *United States v. Castillo*, 449 F.2d 1300, 1301, n.2 (5th Cir. 1971); *United States v. Coronna*, 420 F.2d 1091, 1092, n.2 (5th Cir. 1970); *United States v. Scolnick*, 392 F.2d 320, 323 (3rd Cir. 1968), *cert. denied sub nom. Brooks v. United States*, 392 U.S. 931, 88 S.Ct. 2283, 20 L.Ed.2d 1389 (1968); *United States v. Beigel*, 370 F.2d 751, 756 (2d Cir. 1967). There are undoubtedly other authorities which have been overlooked. In several of these cases, conflicting federal and state statutes involved wiretaps.[9]

This circuit, despite its opinions in *Turner, Magda, Mejias, Burke* and *Beigel*, appears to have made some distinction as to whether state or federal law applies. In *United States v. Manfredi*, 488 F.2d 588, 592 (2d Cir. 1973), involving a joint wiretap investigation between state and federal officers, the court held that the federal government subjected itself to the risk that state courts may impose on such warrants and the evidence obtained under those warrants a higher standard than would a federal court dealing with the interpretation of the federal wiretap statute, citing as its only authority *California v. Jones*, 30 Cal. App.3d 852, 106 Cal.Rptr. 749, *appeal dismissed for want of substantial federal question*, 414 U.S. 804, 94 S.Ct. 163, 38 L.Ed.2d 40 (1973).[10] In any event, the wiretaps in the instant case were not the result of a joint investigation but were solely the product of state action.

*Manfredi* was followed by *United States v. Rizzo*, 491 F.2d 215 (2d Cir. 1974), *cert. denied* 417 U.S. 944, 94 S.Ct. 3069, 41 L.Ed.2d 665 (1974), where again the issue was whether the state officers had complied with the "minimization" requirements of 18 U.S.C. § 2518(5). Again, relying on *Manfredi*, the author stated that the question must be answered in the first instance by reference to state law, although it was stated that, in both *Manfredi* and *Rizzo*, the procedures employed constituted sufficient "minimization" under state and federal law.

In a third case involving state authorized electronic interceptions, following which the results were turned over to federal authorities, *United States v. Marion*, 535 F.2d 697, 702 (2d Cir. 1976), the court, in holding that the requirement of Title III, 18 U.S.C. § 2517(5) for judicial approval of the interception of communications relating to offenses other than those specified in the original wiretap authorization, applies to state wiretap authorizations, said by way of dicta: "If a state should set forth procedures *more* exacting than those of the federal statute, however, the validity of the interceptions and the orders of authorization by which they were made would have to comply with that test as well." [11]

9. *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *United States v. Shaffer*, 520 F.2d 1369, 1372 (3rd Cir. 1975); *United States v. Armocida*, 515 F.2d 49, 52 (3rd Cir. 1975); *United States v. Infelice*, 506 F.2d 1358, 1365 (7th Cir. 1974). There are probably many other authorities along similar lines.

10. In *United States v. Hall*, 543 F.2d 1229 (9th Cir. 1976), *cert. denied* 429 U.S. 1075, 97 S.Ct. 814, 50 L.Ed.2d 793 (1977), the *en banc* court, speaking through Judge Choy, had before it the question of the admissibility in a federal court of evidence pursuant to an arrest by California state officers when that arrest was based on the state agents' use of information gathered by wiretap authorized under federal law but illegal under California law. Acknowledging the binding state authority of *People v. Jones*, 30 Cal.App.3d 852, 106 Cal.Rptr. 749 (1973), two other California cases, and *United States v.*

*Di Re*, 332 U.S. 581, 589, 68 S.Ct. 222, 92 L.Ed. 210 (1948), the *en banc* court said:

We reject the urging to apply *Di Re* for two reasons: we perceive Title III to represent "an applicable federal statute," and we do not believe that *Di Re* is meant to apply to a case such as this. In addition, we conclude that the federal court is not compelled to exclude the seized material merely because of a violation of state law. We thus affirm Hall's conviction.

That the issue is not clear is evidenced by the dissent of three of the thirteen judges.

11. The only case authority cited for this position is *Manfredi*. However, reliance is also placed upon S.Rep. 1097, 90th Cong., 2d Sess., quoted in 2 U.S.Code Cong. & Admin.News at pp. 2112, 2187 (1968), which reads: "No [state] applications may be authorized unless a specific State statute permits it. The State statute must meet the minimum standards reflected as

It is this language in *Marion* upon which the appellants rely. They argue that since the state law requires the sealing of the tapes immediately after the expiration of the term of the original warrant, as well as at the termination of any extension order, the more stringent requirements of the state law must be met before the tapes can be received in evidence.

We agree that under New York law as interpreted by the New York Court of Appeals the tapes could not be received in evidence in a New York State court. However, we do not consider *Manfredi* and its progeny to obligate us automatically to apply in a federal proceeding all provisions of a state wiretap statute containing more stringent requirements than those prescribed by Title III. We believe that at most *Manfredi* requires us, in determining whether to admit a wiretap obtained by a state officer acting under a state court order issued pursuant to a state statute, to

apply only those more stringent state statutory requirements or standards that are designed to protect an individual's right of privacy, as distinguished from procedural rules that are essentially evidentiary in character.[12]

This distinction between procedures governing the interception of wiretap evidence and those governing the preservation of such evidence after interception for trial is important. Since a state's protection of privacy normally reflects principles central to its social and governmental order, our failure to respect its more stringent protection of privacy rights would not only violate principles of federalism, but encourage state and federal law enforcement officials to by-pass state law and to engage in federal forum-shopping of tainted evidence. On the other hand, rules pertaining to the admissibility of evidence are ordinarily governed by the law of the forum.[13]

a whole in the proposed chapter. *The proposed provision envisions that States would be free to adopt more restrictive legislation. . ."* (Emphasis supplied) We do not construe the emphasized language as evidence of Congressional intent to preclude admissibility of such testimony in a federal court where higher standards imposed by a state statute are not met.

12. We recognize that two cases in this Circuit have invoked *Manfredi* in determining the admissibility of wiretap evidence allegedly not sealed in accordance with New York law. *United States v. Capra*, 501 F.2d 267, 277 n. 10 (2d Cir. 1974); *United States v. Ricco*, 421 F.Supp. 401, 407 (S.D.N.Y.1976). In *Capra* the court found that the tapes had been sealed in accordance with both state and federal law, and in *Ricco* the court was applying a requirement—that the tapes be sealed "immediately" upon expiration of the period of authorized eavesdropping—that is common to the state and federal law. Thus, it is certain in *Capra* and quite possible in *Ricco* that the result did not depend on whether state or federal law applied.

13. A second reason for distinguishing between the "right of privacy" and the "evidentiary" dimensions of wiretap regulations is provided by Title III of the Omnibus Crime Control and Safe Street Act, 18 U.S.C. §§ 2515, *et seq.*, the federal statute governing wiretapping by federal and state authorities. In enacting Title III, Congress specifically intended to leave the states free to adopt limitations on eavesdropping more stringent than those applicable to

warrants issued by a federal court. See Sen. Rep.No.1097, reprinted in 1968 U.S.Code Cong. & Admin.News pp. 2112, 2187. To carry out this intention § 2516 authorizes eavesdropping pursuant to a warrant issued by a federal court in compliance with the standards set out in § 2518 or pursuant to a warrant issued by a state court in compliance with § 2518 and with applicable state law. Read as a whole Title III suggests that the reference to state law extends only to the conditions for the issuance and execution of an eavesdropping warrant, as distinguished from post-interception evidentiary procedures such as sealing. Section 2516 itself is captioned "Authorization for interception of . . . communications," suggesting that it does not address post-interception procedures. Similarly, the three general grounds for suppression of wiretap evidence, set out in § 2518(10)(a), refer to defects in the order authorizing interception and in the interception itself. The sealing requirement contains its own standard, § 2518(8)(a), suggesting that wiretap evidence can be suppressed for improper sealing only if the seal does not accord with the federal standard. Cf. *United States v. Curreri*, 388 F.Supp. 607 (D.Md.1974) (Title III does not require exclusion in a federal proceeding of wiretap evidence obtained under a state warrant when exclusion is not justified under any of the three grounds in § 2518(10)(a)).

Thus, although § 2518(10)(a), in conjunction with § 2516, may require exclusion of wiretap evidence obtained under a state warrant when the state standards for the issuance and execu-

Applying these principles here, it is readily apparent that New York's sealing requirements, although vital to the state statutory scheme, do not impose a standard designed to protect an individual's right of privacy but seek only to assure that, once a lawful interception has been completed, the fruits of the seizure will remain intact. *United States v. Lawson*, 545 F.2d 557, 564 (7th Cir. 1975). The sealing requirement is a post-interception procedure relating solely to the later preservation of the evidence, as contrasted to the methods used to obtain it. Since the latter involved the state's interest in protection of privacy, the state's law on the subject was respected in *Manfredi, Rizzo* and *Marion*. However, whatever interest, if any, the state may have in securing federal enforcement of its sealing requirements through application of the exclusionary rule is outweighed by the federal interest in establishing its own standards for the admission of lawfully obtained wiretaps into evidence.

Even if *Manfredi* were extended to post-interception proceedings we do not believe that a federal court is required upon the facts of this case to apply retroactively *Washington's* interpretation of the relevant statutes or its exclusionary rule. The integrity of the factfinding process has not been impaired in this case. There is no suggestion that the tapes were altered in any manner. The tapes were the result of a state investigation in which the federal authorities played no part. At the time of the investigation the only apparent state authority on the subject was *People v. Mangiaracina*, a decision by the Supreme Court of Kings County on July 15, 1976, which held that the sealing need not take place until immediately after the expiration of the last extension date.[14] The universal practice of state and federal authorities was to arrange for the sealing of tapes after the

expiration of the last extension order. Thus the state police, in executing the court warrants after *Mangiaracina* but before *Glasser* and *Washington* acted reasonably in the good faith assumption that they were not required to seal the tapes until the extensions of the warrants had expired. Indeed there was no motive for them not to seal each installment immediately upon its completion if there were grounds to believe at that time that such earlier sealing was required.

The evidence obtained by the state law enforcement authorities was in good faith compliance with the prevailing constitutional norms. It remained in good faith at least until the *Glasser* decision. As stated in *United States v. Peltier*, 422 U.S. 531, 537, 95 S.Ct. 2313, 2317, 45 L.Ed.2d 374 (1975):

> The teaching of these retroactivity cases is that if law enforcement officers reasonably believed in good faith that evidence they had seized was admissible at trial, the "imperative of judicial integrity" is not offended by the introduction into evidence of that material even if decisions subsequent to the search or seizure have broadened the exclusionary rule to encompass evidence seized in that manner.

See also *Linkletter v. Walker*, 381 U.S. 618, 636–40, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965).

While *Peltier* was a search and seizure case, and we are here confronted with a technical violation of the New York law with respect to the sealing of tapes obtained as a result of valid orders entered by state court judges, we think the reasoning of *Peltier* and *Linkletter* is controlling. Under the circumstances of this case and the reasoning of *Peltier* and *Linkletter* we do not believe that the police should be

---

tion are not satisfied, the *Manfredi* rule, limited to the conditions for issuance and execution of a wiretapping order, is not only consistent with but in furtherance of the legislative intent and represents an appropriate exercise of the court's supervisory powers.

**14.** See: *United States v. Fury*, 554 F.2d 522, 533. However, Judge Polsky had ruled in con-

formance with *Fury* in *People v. Rosenberg*, N.Y.L.J., October 20, 1976, at 13, col. 1 (Sup.Ct. Kings Co.). Judge Polsky later reversed himself in *People v. Rao*, 53 A.D.2d 904, 386 N.Y. S.2d 441, 1977 (Sup.Ct. Kings Co.), which reversal followed *Glasser*.

penalized for failure to anticipate the later interpretation of § 700.50(2) by *Glasser, Weiss* and *Washington*.[15]

Appellants urge only a violation of the New York statute, CPL § 700.50(2), which was modeled after the federal statute, 18 U.S.C. § 2518. There is no history indicating why the state legislature did not use the precise wording of 18 U.S.C. § 2518(8)(a). *Fury, supra*, at 533.

In *Linkletter v. Walker*, 381 U.S. 618, 628, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965), it was held that "the Court may in the interest of justice make [a] rule prospective . . . where the exigencies of the situation require such an application." We are convinced that the "interest of justice" is promoted in this case where only a technical violation relating to an interpretation of the state statute is involved, and where no state court had rendered any authoritative construction of the statute at the time the taps were conducted. Under the exigencies of the situation there was no error in denying appellants' motion to suppress the tapes.

## II. SEVERANCE

The only other issue which merits discussion is the contention by Ismael Romero that the district court erred, at mid-trial, in not granting him a severance of the substantive count of the indictment, in which he was named as the sole defendant. He claims that the evidence introduced against him on the substantive count may have "spilled over" to convict him on the conspiracy count and, in turn, that the evidence introduced against his codefendants on the conspiracy count may have "spilled over" to convict him on the substantive count.

■ We note initially that the substantive count was properly joined for trial in one indictment with the conspiracy count. Count Three charged Romero with the distribution of approximately 106.3 grams of heroin on December 3, 1976, a transaction which was alleged as well in Overt Act 24 in the conspiracy count (Count One) of the indictment. Thus, the joinder of these two offenses was proper under F.R.Cr.P. 8(a), which provides:

(a) *Joinder of Offenses.* Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

We are of the opinion that Romero has waived any claim of error under Rule 8 by his failure to move before trial for a severance. Rule 12(b)(2) and 12(f), F.R.Cr.P.; *United States v. Green*, 561 F.2d 423 (2d Cir. 1977), *cert. denied* 434 U.S. 1018, 98 S.Ct. 739, 54 L.Ed.2d 764 (1977).

■ Romero would have us evaluate this issue under Rule 14 which provides:

*Relief from Prejudicial Joinder*

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

In *United States v. Stirling*, 571 F.2d 708, 733 (2d Cir. 1978), this court noted the heavy burden imposed on an appellant advancing such an argument:

*ser* and the appeal was denied by a single judge.

**15.** The New York Court of Appeals had not at that time expressly approved or disapproved of *Glasser*, but an effort was made to appeal *Glas-*

**1228**

Thus, the real question is not whether there was a misjoinder under the liberal provisions of Fed.R.Crim.P. 8, but whether the refusal of the district court to sever [the appellant] from the main trial was so unfairly prejudicial under Rule 14 as to constitute an abuse of discretion. This is a difficult burden for [the appellant] to meet. "The determination of the elusive criterion of prejudice rests in judicial discretion at the trial level, and is virtually unreviewable." 8 *Moore's Federal Practice* ¶ 14.02[1], at 14–3 (2d ed. 1977) (footnote omitted). While we do not shirk our responsibility of review, we are reluctant to overturn a conviction for denial of a motion for severance unless there is a showing of substantial prejudice. *United States v. Miley*, 513 F.2d 1191, 1209 (2d Cir.), *cert. denied*, 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 62 (1975). It is not sufficient merely to show that the accused would have had a better chance for acquittal at a separate trial. *United States v. Corr*, 543 F.2d 1042, 1052 (2d Cir. 1976); 8 *Moore's Federal Practice*, ¶ 14.04[1], at 14–14.2 to 14–15 (2d ed. 1977) (footnote omitted).

After consideration of the record, briefs and oral argument, we are satisfied that Romero has not met this burden.[16]

The judgments of conviction are affirmed.

AFFIRMED.

---

**16.** We assume *arguendo* Romero joined in the mid-trial severance motion made by counsel for other defendants.