**UNITED STATES of America,**

v.

**Frederick A. EYERMAN, Defendant.**

**No. 87 Cr. Misc. 1–pg.–8 (MP).**

United States District Court,
S.D. New York.

May 13, 1987.

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. by Jess Fardella, Asst. U.S. Atty., for U.S.

Walder, Sondak, Berkeley & Brogan, P.A., Roseland, N.J. by Justin P. Walder, for defendant.

## OPINION

MILTON POLLACK, Senior District Judge.

Eyerman is accused of criminal contempt. The case was initiated on March 3, 1987 and is set for a jury trial for May 26, 1987, with the approval of counsel. Eyerman now presents six pre-trial motions for decision. They comprise applications for further discovery, a bill of particulars, dismissal for lack of venue, suppression of tape recordings, for a pretrial hearing on the existence of a sufficient foundation for the introduction of the tapes, and a motion that this Court recuse itself from the trial, in accordance with 28 U.S.C. § 455. The motions will be disposed of seriatim.

### I. *Background*

In January 1983, the Securities and Exchange Commission ("the SEC") filed a civil complaint against First Jersey Securities, Inc. ("FJS"), Robert Brennan, president of FJS and another. The complaint alleged that FJS, as underwriter of certain securities, bid for and purchased such securities before completing its participation in the distribution of the stock, violating § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b–6 thereunder, 17 C.F.R. § 240.10b–6.

In November 1984, a Final Judgment of Permanent Injunction was signed by the Court and consented to by FJS. This Injunction permanently enjoined FJS from violating Rule 10b–6. The Injunction contained, as suggested initially by FJS, a provision for a court-appointed Consultant to review the existing practices and procedures at FJS "to ensure that all such practices, operations and procedures are in compliance with the securities laws, [SEC] regulations, and self-regulatory organization guidelines." This Injunction provided that the court-appointed Consultant, in order to achieve the desired goals, "shall have access to any and all documents in the possession of First Jersey" and "shall receive the full cooperation of First Jersey and all of its officers, directors, agents and em-

ployees in obtaining such access and in making persons available for interviews by the Consultant." The decree was made binding upon "those persons in active concert or participation with First Jersey who receive actual notice of [the Injunction], by personal service or otherwise, and any other person, as defined in Rule 65(d) of the Federal Rules of Civil Procedure," who include the parties to the action, their agents, servants, employees, and attorneys.

In January, 1985, after a canvas was made by the parties for a suitable person, Benjamin Lubin was appointed by this Court, with the approval of the parties, as the Consultant to "review and report upon and make recommendations pertaining to the sales practices, business operations and supervisory procedures of First Jersey." As part of his investigation, according to the Government, Lubin interviewed Eyerman, obtained FJS documents from him, responded to certain of Lubins's concerns, and, with Eyerman present, visited several FJS branch offices, where he met with branch managers and registered representatives, reviewed their practices and procedures, and examined FJS documents. Lubin ultimately filed two extensive reports in which he reviewed the practices and procedures at FJS, made recommendations for changes, and then monitored the implementation of those recommendations.

During all relevant periods, Eyerman has been Vice-President and Director of Compliance at FJS. As Compliance Director, Eyerman was responsible to see to it that the operations, practices and procedures of FJS conformed to federal and state securities laws and regulatory requirements of the SEC, NASD, securities regulatory agencies of the various states, and FJS' internal policies and procedures.

On March 3, 1987, the Government presented an Application for an Order to Show Cause for Criminal Contempt against Eyerman. This application was granted, initiating a criminal contempt proceeding pursuant to Rule 42(b) of the Federal Rules of Criminal Procedure.

In an affidavit accompanying the Order, the Government alleged that Eyerman had acted to frustrate the Consultant's investigation. The Government charged that, in August 1986, Eyerman had met with the branch manager of the FJS office in Danvers, Massachusetts before a scheduled visit there from Lubin and had instructed the branch manager to conceal records, give false information to Lubin, and destroy documents, which the branch manager then supposedly did. Under the supervision of an investigator from the United States Attorney's Office for the Southern District of New York, the branch manager was at the time of the visit cooperating with the Government and consented to and did in fact wear a Nagra body recorder and recorded his conversation and activities with Eyerman on that evening. The same thing allegedly occurred the next morning.

## II. *Motion to Dismiss for Lack of Venue*

Defendant claims that venue in this case is improper in the Southern District of New York. He notes that the United States Constitution twice states that criminal trial shall be held in the state where the crime was committed. U.S. Const. Art. III § 2 cl. 3; amend. VI. Eyerman contends that, because the acts which constituted his alleged contempt took place in Massachusetts, he may not be tried on the contempt charge in New York.

The Second Circuit has spoken with great specificity on this issue:

> [C]onduct which violates a federal court order may occur outside the district in which the order was issued. The federal courts, however, have never required that criminal contempt proceedings be brought only where the acts occurred ... The contumacious conduct may be punished in the district where the order was issued, whether or not the acts occurred elsewhere, the effects of the acts fell elsewhere or the evidence thereof is located elsewhere. *United States v. Reed*, 773 F.2d 477, 481 (2d Cir.1985).

The court went on to explain that:

> Where essential elements of a crime are related to the integrity of the proceedings of judicial tribunals in districts other than where the acts took place, for

example, those tribunals should not be left to the generosity of prosecutors or judges in other districts to defend their powers. Such officials may have little familiarity with the underlying case. They also may have little reason other than considerations of comity to enforce orders from other districts and limited resources to do so. The district in which the court order was issued is thus said to have sufficient contact with the criminal contempt to be the site of the prosecution. *Id.*

■ Eyerman attempts to distinguish *Reed* on the basis that there were no longer any "ongoing judicial proceedings" in the Southern District at the time that Eyerman committed his alleged contempt in Massachusetts. However, this Court's Injunction of November 1984, was by its own terms, a *permanent* one. Further, the Injunction, consented to by FJS, explicitly states, "this Court shall retain jurisdiction in this matter for the interpretation and performance of this decree." Clearly, this Court retains ongoing authority to enforce its 1984 Injunction. Defendant's motion to dismiss the criminal contempt proceeding before this Court for lack of venue is denied.

### III. *Discovery and Bill of Particulars*

Eyerman moves for discovery from the Government. He has received a massive amount of data, which the Government provided voluntarily. A detailed review of his additional requests satisfies the Court that he is not entitled to anything more.

■ The defendant's motion for additional discovery is denied, except that any further material in possession of the Government, which constitutes material to be disclosed under 18 U.S.C. § 3500 bearing on the direct examination of witnesses, shall be produced after each has testified, as provided in the statute. At the same times, the Government shall disclose any material it must reveal under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). See *United States ex rel. Lucas v. Regan,* 503 F.2d 1, 3 n. 1 (2d Cir.1974), *cert. denied,* 420 U.S. 939, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975) (Government not required to turn over *Brady* material before trial).

■ Defendant also moves for a bill of particulars. Rule 7(f) of the Federal Rules of Criminal Procedure provides that the Court "may direct the filing of a bill of particulars." A motion for a bill of particulars is addressed to the discretion of the court. *United States v. Panza,* 750 F.2d 1141, 1148 (2d Cir.1984).

■ Bills of particulars are granted only where they are necessary, (1) to inform the accused of the charge against him with sufficient precision to enable him to prepare his defense and avoid surprise, and (2) to enable him to plead his acquittal or conviction in bar of any further prosecution of the same offense.

■ A bill of particulars is not an investigative vehicle for the defense nor is it a device by which the defendant may compel disclosure of the Government's evidence in advance of trial. An inquiry into the Government's legal theory is not a proper purpose for a bill of particulars, nor may defendant obtain information via such a bill, which the Government need not prove at trial.

The Order to Show Cause filed in this case, and the voluntary disclosures made by the Government to Eyerman in the course of the correspondence between counsel, provide defendant ample notice of the grounds for the contempt charge. Defendant's prolix 11 page request for 69 particulars is denied.

### IV. *Suppression of Tape Recordings*

Eyerman moves to suppress the tapes made via the microphone worn by the Danvers branch manager, contending that the taping constituted a prohibited interception under Massachusetts law. Mass.Ann. Laws ch. 272 § 99(C)(1) (Law Co-op.1980). Massachusetts bars disclosure of the contents of recordings made in violation of the statute. § 99(C)(3).

Under Massachusetts law, "[t]he term 'interception' means to secretly hear, se-

cretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all such parties to such communication." § 99(B)(4). An exception is provided for a "law enforcement officer" who is a party to the communication and who makes the recording "in the course of an investigation of a designated offense." *Id.* Massachusetts provides a list of "designated offenses," with the qualification that such offense shall be "in connection with organized crime." § 99(B)(7)

Before adjudicating how the Massachusetts statute would apply to this case, it behooves this Court to first determine whether Massachusetts law or federal law should govern the admissibility of the tape recordings. It is undisputed that the recordings made with the consent of the branch manager are admissible under federal law, which allows the interception of oral communication if consent is given by one party to the communication. 18 U.S.C. § 2511(2)(c). Thus, if federal law governs the admissibility question, there is no need to examine the state law question.

It is well settled throughout the federal system that federal law governs the admissibility of evidence in federal criminal cases and that state laws which would bar the admission of evidence have no effect on a federal court's determination. *United States v. Turner,* 558 F.2d 46, 49 (2d Cir. 1977); *United States v. Butera,* 677 F.2d 1376, 1380 (11th Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 958 (1983); *United States v. Horton,* 601 F.2d 319, 323 (7th Cir.), *cert. denied,* 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979); *United States v. Nelligan,* 573 F.2d 251, 253 (5th Cir.1978); *United States v. Shaffer,* 520 F.2d 1369, 1372 (3d Cir.), *cert. denied,* 423 U.S. 1051, 96 S.Ct. 779, 46 L.Ed.2d 640 (1976); *United States v. Keen,* 508 F.2d 986, 989 (9th Cir.1974), *cert. denied,* 421 U.S. 929, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975).

Defendant, however, points to a recent trend in the Second Circuit which seems to carve an exception from this rule. In *United States v. Sotomayor,* 592 F.2d 1219, 1225–26 (2d Cir.), *cert. denied,* 442 U.S. 919, 99 S.Ct. 2842, 61 L.Ed.2d 286 (1979), wiretaps were placed by state agents, acting pursuant to an Order issued by a Justice of a New York State court. Defendant challenged the admissibility of the tapes in federal court on the ground that the tape had not been sealed in accordance with the requirements of New York State law, which were more stringent than the corresponding federal statute.

In discussing which law should govern the admissibility of the tapes, the court stated, "in determining whether to admit a wiretap obtained by a state officer acting under a state court order issued pursuant to a state statute, [a federal court need] apply only those more stringent state statutory requirements or standards that are designed to protect an individual's right of privacy, as distinguished from procedural rules that are essentially evidentiary in character." *Id.* at 1225.

The court explained its reasoning as emanating from a desire not to interfere with a state's legitimate sphere of authority: "since a state's protection of privacy normally reflects principles central to its social and governmental order, our failure to respect its more stringent protection of privacy rights would ... violate principles of federalism." The court affirmed the district court's decision to admit the evidence, holding that the state sealing requirement was a procedural one not implicating basic privacy rights.

The *Sotomayor* dicta has been cited in several subsequent cases. In *United States v. Lilla,* 699 F.2d 99, 102 n. 3 (2d Cir.1983), the court faced a situation where state and federal statutes were indistinguishable, thus not requiring the court to choose which to apply. The court, in a footnote, cited to *Sotomayor,* twice characterizing the *Sotomayor* language as a "suggestion."

In *United States v. Aiello,* 771 F.2d 621, 627 (2d Cir.1985), wiretaps were effected by state officers acting pursuant to a state warrant. The court declined to apply the

more stringent state law requirements because the wiretaps occurred before a reinterpretation of state law by later state court decisions. Lastly, in *United States v. Spadaccino*, 800 F.2d 292, 296–97 (2d Cir.1986), the court noted that *Sotomayor* "might require the exclusion of evidence obtained in violation of a substantive provision of a state statute designed to protect an individual's right of privacy." As in *Aiello*, the court did not apply the more stringent state law because this law resulted from a subsequent state court re-interpretation of the state statute.

In summary, despite the continued citation of *Sotomayor*, the Second Circuit has never actually applied state law to bar admission of evidence in a federal trial when federal law allowed the evidence to be admitted but state law did not.

It seems clear that the Massachusetts statute at issue here is "designed to protect an individual's right to privacy" in that it outlaws secret, unauthorized interception of a person's oral communications. Thus, defendant's motion asks this Court to resolve whether *Sotomayor* requires that the tape recordings offered by the Government, though admissible under federal law, should be suppressed because, *arguendo*, the Massachusetts statute bars admissibility.

This exact question was addressed recently by a sister Circuit. In *United States v. Jarabek*, 726 F.2d 889, 899–900 (1st Cir.1984), the court faced a situation where defendant had already been tried before a Massachusetts court. Wiretap evidence obtained in a joint federal-state investigation had been suppressed at the state trial because it was obtained in violation of the same Massachusetts statute cited by defendant in the instant case. *See Commonwealth v. Jarabek*, 384 Mass. 293, 424 N.E.2d 491 (1981).

The First Circuit affirmed the district court's decision to admit the recordings on the basis of federal law. The appeals court explicitly distinguished *Sotomayor* on the basis that the *Sotomayor* investigation was conducted solely by state officials. In reviewing several relevant Second Circuit cases, the *Jarabek* court noted that, wherever the *Sotomayor* considerations were addressed, it was in the context of an investigation which was heavily influenced, if not exclusively conducted, by state authorities.

Upon analysis of *Sotomayor*, it is clear that such considerations are at the heart of the issue before this Court. The concerns of federalism are most implicated when the state has exercised its resources, either by conducting an investigation or by authorizing a wiretap order. Where a state has demonstrated its emphasis on privacy in enacting a stringent wiretap statute, it would ill serve the concerns of federalism for a federal court to allow state officials to flaunt that law by making cases in federal court with evidence that their state legislature had deemed tainted.

■ However, in a federal investigation of a federal crime, prosecuted in federal court, the situation is quite different. Here, there was absolutely no involvement of state authorities. The investigation of Eyerman was managed and conducted exclusively by agents acting out of the United States Attorney's Office for the Southern District of New York. They were acting to check compliance with an Injunction issued by this Court. Where a prosecution involves solely federal concerns, as here, the issues of federalism addressed by *Sotomayor* are not implicated. Hence, this Court should follow the general rule and apply federal law, not the Massachusetts statute, in determining the admissibility of the tape recordings. Since Massachusetts law is not applicable, defendant's motion, which was based on the Massachusetts statute, is denied.

### V. Pretrial Hearing on Standard of Proof

■ Eyerman requests a pretrial hearing to determine whether there is sufficient foundation for the admission of the tape recordings. Whether the Government meets the relevant standard of proof permitting the admission into evidence of the tape recordings is a matter to be determined at trial. No declaratory judgment

on the appropriate evidentiary requirements for admissibility of the evidence is needed or appropriate at this time. Defendant's request for a pretrial hearing is denied.

## VI. *28 U.S.C. § 455*

Defendant requests that this Court recuse itself from the trial of this case, pursuant to 28 U.S.C. § 455, which states in part:

(a) Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might be reasonably questioned.

(b) He shall also disqualify himself in the following circumstance[ ]:

(1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.

Monroe H. Freedman has furnished a Declaration under penalty of perjury, and Geoffrey C. Hazard, Jr. has furnished a sworn affidavit, each of which are submitted in support of defendant's motion. Freedman and Hazard present themselves as experts on ethics, and, as such, each expresses his opinion on how, as a matter of law, the Court should decide the pending motion. They support their submission with a weighty compendium of their extracurricular activities to give verisimilitude to their sworn legal conclusions that, in their opinion, the Court should not try this contempt case.

Justin Walder, Eyerman's lawyer, the only source of the information on which the experts rely, does not represent FJS, claims that he had no personal involvement with any of the matters or proceedings in which FJS or Brennan was involved, and disclaimed at the hearing any personal knowledge of any of the purported background which he presumably retold to Messrs. Freedman and Hazard.[1]

Supplying such affidavits under these circumstances seems rather presumptuous, considering that the affiants have not been asked by the Court for their views on the law and how the motion should be decided.

■ What makes their gratuitous sworn legal opinions even more inappropriate is their apparent obliviousness to the self-evident utter absence of any factual basis in the record for a cognizable opinion from them—expert or other. Indeed, they should have recognized that uninformed hearsay alone is the basis on which they were asked to express their legal opinions. Nevertheless, in the manner in which they couch their papers, they assume and aver assumptions as facts, state selected hypotheses of what the facts might have been, and take leave to assert rank hearsay of the second or third degree, *dehors* the record, as support for their legal opinions. Mere echoes of hearsay in lieu of a factual foundation will not support or authorize an expression of expert opinion, even when such an opinion is requested.

The lesson to be derived from Judge Weinfeld's opinion in *United States v. Corr* is usefully repeated here:

Disqualification under section 455(a) must rest upon a factual basis. The test under that provision is not the subjective belief of the defendant or that of the judge, but whether facts have been presented that, assuming their truth would lead a reasonable person reasonably to infer that bias or prejudice existed, thereby foreclosing impartiality of judgment. The claim must be supported by facts which would raise a reasonable inference of lack of impartiality on the part of the judge in the context of the issues presented for his consideration. 434 F.Supp. 408, 412–13 (S.D.N.Y.1977).

■ The present is hardly an occasion for which credible experts supply legal opinions. The experts might have been better advised to have been guided by a reasonable degree of skepticism of facially suspect hearsay when being solicited for submission of their extracurricular opinions of law.

---

1. Mr. Walder, the informant for Freedman and Hazard, in an affidavit hereon, states: "In my opinion, the Honorable Milton Pollack in all proceedings in the within entitled matter has been subjectively fair, impartial and judicious."

In sum, no cognizable personal bias of the Court against Eyerman is alleged, and no facts are shown from which the Court's impartiality might be reasonably questioned. Defendant's motion pursuant to 28 U.S.C. § 455 is denied.

So ordered.