**UNITED STATES of America,**

v.

**James Sutton REGAN, Charles M. Zarzecki, Jack Z. Rabinowitz, Paul Berkman, Steven Barry Smotrich, Bruce Lee Newberg, Defendants.**

**No. 88 Cr. 517 (RLC).**

United States District Court, S.D. New York.

Feb. 3, 1989.

---

Benito Romano, U.S. Atty., S.D.N.Y., New York City (Mark C. Hansen, Neil Cartusciello, Peter G.A. Safirstein, Asst. U.S. Attys., of counsel), for U.S.

Lowenstein Sandler Kohl Fisher & Boylan, Roseland, N.J. (Theodore V. Wells, of counsel), for defendant Regan.

Grand & Ostrow, New York City (Paul Grand, Diana Parker, of counsel), for defendant Zarzecki.

Robert Hill Schwartz, P.C., New York City (Robert Hill Schwartz, of counsel), for defendant Rabinowitz.

Robinson Wayne & LaSala, Newark, N.J. (John D. Arseneault, of counsel), for defendant Berkman.

Hayden, Perle and Silber, New York City (Alan Silber, Paulette L. Pitt, of counsel), for defendant Smotrich.

Gerald B. Lefcourt, P.C., New York City (Gerald B. Lefcourt, of counsel), Goldman & Hafetz, New York City (Frederick P. Hafetz, of counsel), for defendant Newberg.

**ROBERT L. CARTER, District Judge.**

This opinion disposes of several motions brought by defendants in this complex RICO prosecution involving the activities of Princeton/Newport Partners, L.P. ("PNP"), a limited partnership whose primary business was the investment of the assets of its general and limited partners in various types of sophisticated securities and commodities, concentrating primarily on financial arbitrage.[1] Defendant Regan was one of two managing general partners of PNP. Defendants Rabinowitz and Zarzecki were general partners of PNP and held executive positions as the chief financial officer and head of trading, respectively. These three defendants were also the principals in Oakley Sutton Management Corporation ("OSMC"), a Delaware corporation that provided services for the benefit of PNP and its related or subsidiary entities. Defendant Berkman was a general partner of and principal trader for Prince-

---

1. PNP has recently dissolved. It formerly commanded a capital investment of approximately $175,000,000, creating four subpartnerships to focus on different types of securities. Princeton/Newport Index Partners specialized in equity, equity options and index options, that is, in "market basket" type trading. Princeton/Newport Option Partners traded options and underlying securities. Princeton/Newport Arbitrage Partners specialized in convertible bond and warrant hedging. Princeton/Newport Income Partners focused on fixed income securities.

ton Newport Arbitrage Partners ("PNA"),[2] a subsidiary of PNP that engaged in a particular form of securities investing known as "convertible hedging" or "convertible arbitrage." Defendant Smotrich was an employee of OSMC and the comptroller of PNP and its related entities. Defendant Newberg was a trader for the investment bank Drexel Burnham Lambert, Inc. ("Drexel") from July, 1980, until approximately March, 1986.

### Motion To Suppress Grand Jury Testimony

Defendant Steven Smotrich ("Smotrich") has moved to suppress testimony that he gave at federal grand jury appearances on March 4, 1987, and December 17, 1987. He claims that his waiver of his Fifth Amendment right not to testify was not knowing or voluntary.

Smotrich appeared at both sessions of the grand jury in response to subpoenas which were addressed not to him personally, but to the "Custodian of Records, Oakley Sutton Management Corp." At both appearances he was represented by an attorney retained by OSMC. At the outset of the March 4 appearance only, he was advised of his Fifth Amendment rights and was asked whether he consented to be represented by the OSMC attorney for purposes of the appearance despite the fact that a conflict of interest could arise during the course of the investigation between him and OSMC or other persons at OSMC. He responded that he understood his rights and consented to be represented by the OSMC attorney.

With respect to his December 17 appearance, Smotrich complains that he was not advised that he was a target of the grand jury's investigation and was not readvised of his Fifth Amendment rights. It is his contention that targets of a grand jury investigation must be advised of their status before they testify. In support of this contention, he cites *United States v. Jacobs*, 531 F.2d 87 (2d Cir.1976), *vacated and remanded*, 429 U.S. 909, 97 S.Ct. 299, 50 L.Ed.2d 277 (1976), *original decision adhered to*, 547 F.2d 772, (2d Cir.1976), *cert. granted*, 431 U.S. 937, 97 S.Ct. 2647, 53 L.Ed.2d 254 (1977), *cert. dismissed as improvidently granted*, 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978).[3]

This is not the law. *Jacobs* was an unusual case involving the court's supervision of a special Department of Justice Strike Force that was not abiding by the rules of the United States Attorney in the district where the Strike Force operated. The court expressly limited its holding to the facts of the case, indicating that its opinion was intended to have "no prospective application as precedent for the District Courts on the constitutional issue." *Jacobs*, 547 F.2d at 775.

Witnesses before a grand jury do not have a constitutional right to be advised that they are a target of the grand jury's investigation. *United States v. Washington*, 431 U.S. 181, 189, 97 S.Ct. 1814, 1820, 52 L.Ed.2d 238 (1977). Failure to give such a warning does not invalidate an indictment. *United States v. D'Auria*, 672 F.2d 1085, 1093 (2d Cir.1982). Nor does it require the exclusion of grand jury testimony. *United States v. Valentine*, 820 F.2d 565, 572 (2d Cir.1987); *United States v. James*, 609 F.2d 36, 41 (2d Cir. 1979), *cert. denied*, 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980).

Smotrich's claim that his testimony should be suppressed because he was not readvised of his Fifth Amendment rights on December 17 is also without merit. Although there may be circumstances in which coercion could be evidenced by a prosecutor's failure to advise a witness of his Fifth Amendment rights, this is clearly

---

**2.** PNA became "Englewood Partners d/b/a Princeton/Newport Arbitrage Partners" ("Englewood") after March 31, 1985.

**3.** Smotrich also relies on the *United States Attorneys Manual*, § 9–11.260 (April 4, 1985) ("USAM"), and the *A.B.A. Project on Standards for Criminal Justice*, Standards Relating to the Prosecution Function (Approved Draft 1971) § 3.6(d). This reliance is misplaced. The USAM creates no substantive rights. *United States v. Catino*, 735 F.2d 718, 725 (2d Cir.1984); *United States v. Nakashian*, 635 F.Supp. 761, 766–67 (S.D.N.Y.1986) (Stanton, J.). Nor does an A.B.A. proposal.

not such a case. Smotrich was accompanied by counsel at both his grand jury appearances, and he was advised of his Fifth Amendment rights at his March 4 appearance. No claim is made that he was unaware of his rights, nor would such a claim be credible. In these circumstances, there is no constitutional bar to using Smotrich's testimony in a subsequent prosecution against him. *See United States v. Horowitz*, 452 F.Supp. 415, 420 (S.D.N.Y. 1978) (Duffy, J.); *Moynahan v. Manson*, 419 F.Supp. 1139, 1150 (D.Conn.1976).

Smotrich's motion to suppress his March 4 testimony is also without merit. He claims that he was misled regarding the scope of the grand jury's investigation. He was told that it concerned possible violations of federal criminal law in connection with insider trading involving Goldman, Sachs & Co., Robert Freeman and other persons. Smotrich understood that he did not have to provide testimony that would tend to incriminate him, whether or not he believed the grand jury was seeking such evidence. In fact, Smotrich makes no factual allegations which would suggest that what he was told was untrue, and even if Smotrich was a target of the grand jury investigation as of March 4, he need not have been informed of that fact. *See United States v. DePalma*, 461 F.Supp. 778, 791–93 (S.D. N.Y.1978) (Sweet, J.).

■ Smotrich claims as a separate grounds for excluding his grand jury testimony that the government violated Rule 6(e), F.R.Crim.P., by failing to obtain a court order before disclosing in affidavit form the contents of his grand jury testimony to a United States Magistrate in the District of New Jersey for purposes of obtaining a search warrant. As explained elsewhere in this opinion, the government's disclosure of grand jury testimony in this instance did not violate Rule 6(e), and even if it did, exclusion of his testimony is not the appropriate remedy. The disclosure therefore provides no support for Smotrich's motion.

### Motion To Suppress Tape Recordings

■ Defendant Bruce Newberg ("Newberg") has moved to suppress certain tape recordings seized in a December 17, 1987 search of the business premises of OSMC and PNP in Princeton, New Jersey. The recordings were made in the OSMC/PNP trading room at the Princeton premises on equipment maintained by the firm to record automatically all calls to and from the trading floor.

The recordings are of telephone conversations between OSMC/PNP personnel in Princeton and employees of Drexel in Drexel's Beverly Hills, California offices.[4] Newberg claims that he and other Drexel employees whose conversations were recorded did not consent to such recording.

Newberg concedes that federal rather than state law normally governs the admissibility of evidence in federal criminal proceedings.[5] He argues, however, that an exception to this rule was recognized in *United States v. Sotomayor*, 592 F.2d 1219 (2d Cir.1979). In *Sotomayor* the court held that wiretap recordings which were solely the product of New York state action were admissible in a federal criminal prosecution even though they were not sealed in compliance with New York law. However, in reaching this decision, the court distinguished a line of cases stemming from *United States v. Manfredi*, 488 F.2d 588 (2d Cir.1973), as follows:

We believe that at most *Manfredi* requires us, in determining whether to admit a wiretap obtained by a state officer acting under a state court order issued pursuant to a state statute, to apply only those more stringent state statutory requirements or standards that are designed to protect an individual's right of

---

**4.** Defendant states in his brief that recordings were also made of conversations between New Jersey and PNP employees located at PNP's Newport Beach, California office.

**5.** "It is well settled throughout the federal system that federal law governs the admissibility of

evidence in federal criminal cases and that state laws which would bar the admission of evidence have no effect on a federal court's determination." *U.S. v. Eyerman*, 660 F.Supp. 775, 779 (S.D.N.Y.1987) (Pollack, J) (citations omitted).

privacy, as distinguished from procedural rules that are essentially evidentiary in character. *Sotomayor,* 592 F.2d at 1225.

Newberg argues that this dictum establishes a rule for the Second Circuit requiring the court to defer to stricter state exclusionary rules when the state rules are designed to protect an individual's right of privacy rather than being merely procedural. He further argues that the *Sotomayor* rule requires suppression of the tape recordings at issue here, because they would not be admissible in a California court under provisions of the California Penal Code dealing with invasions of privacy. *See* Cal. Penal Code §§ 630 *et seq.*

Newberg cites Cal.Penal Code § 631 as the statutory provision to which the court must defer. However, the line of cases which offers the clearest support for Newberg's claim has viewed § 631 to be inapplicable to the recording of a telephone conversation by a party to the conversation. *See, e.g., Rogers v. Ulrich,* 52 Cal.App.3d 894, 898–99, 125 Cal.Rptr. 306, 308–09 (1975); *Warden v. Kahn,* 99 Cal.App.3d 805, 811–14, 160 Cal.Rptr. 471, 475–77 (1980).

If any section of the California privacy law reaches the recordings at issue here, it is Cal.Penal Code § 632 ("§ 632") which makes it a crime to "eavesdrop upon or record" a "confidential communication." § 632(a). The term "confidential communication" is defined to include "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering ... or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." § 632(c). The use of evidence obtained as a result of prohibited eavesdropping or recording is expressly prohibited "except as proof in an action or prosecution for violation of this section." § 632(d).

For the recordings at issue here to fall within the scope of § 632, it would have to be determined that the conversations recorded were "confidential communications" for purposes of § 632. It is doubtful that Newberg could meet this evidentiary burden, since it would be hard to overcome a natural presumption that persons making telephone calls from crowded and noisy trading rooms should expect that "the communication may be overheard." *See* § 632(c).

There is, however, another problem with Newberg's reliance on § 632. In the most recent decision of the California Court of Appeals interpreting the reach of § 632, it was held that the section does not apply to recordings made by one of the parties to the conversation, but only to third party eavesdropping. *Reed v. Dick,* 246 Cal. Rptr. 131, 137 (Cal.Ct.App.1988). On the other hand, there is strong authority to the contrary in earlier California cases, including dicta by the Supreme Court of California.[6] *See e.g., Ribas v. Clark,* 38 Cal.3d 355, 360–61, 212 Cal.Rptr. 143, 696 P.2d 637 (1985); *Olson v. Superior Court,* 63 Cal. App.3d 188, 191, 133 Cal.Rptr. 573, 574 (1976). The inescapable conclusion is that the question of whether § 632 applies to recordings made by a party to the conversation is either in flux or is simply unsettled in California law.

At the very least, Newberg's claim that this court must defer to the California privacy law is vitiated by this state of affairs. To sustain Newberg's claim, it would be necessary to hold that *Reed* was wrongly decided and that the California Supreme Court would probably abide by the interpretation of § 632 contained in the line of cases which *Reed* counters. He offers no argument to support such a holding. In-

---

**6.** The *Reed* court noted that "there are Court of Appeal cases which could be construed to suggest a contrary result. But in none of them were the issues we here resolve, raised or considered." 246 Cal.Rptr. at 137. It would be fairer to say that the court simply disagreed with these earlier cases, and, in particular, with an earlier decision by the same division of the Court of Appeals. *See Warden v. Kahn,* 99 Cal.App.3d 805, 811–14, 160 Cal.Rptr. 471, 475–77 (1979). The author of the *Reed* opinion dissented in *Warden.*

deed, he does not even mention *Reed* in his brief.

■ Nor do the problems with Newberg's claim end here. Even if the court decided that § 632 does apply to the OSMC/PNP recordings, the *Sotomayor* rule would not require exclusion of the tapes. In *U.S. v. Eyerman*, 660 F.Supp. 775 (S.D.N.Y.1987) (Pollack, J.), the court reviewed the *Sotomayor* opinion and concluded that its concerns were not implicated when the evidence at issue was the product of "a federal investigation of a federal crime, prosecuted in federal court." The rule was merely intended to prevent state officials from flaunting state law "by making cases in federal court with evidence that their state legislature had deemed tainted." *Id.* at 780; *see also United States v. Jarabek*, 726 F.2d 889, 899–900 (1st Cir.1984). Because the recordings at issue in the instant case were produced by private parties, rather than by governmental action on any level, the concerns expressed in *Sotomayor* are even less implicated than in *Eyerman*. The *Sotomayor* rule simply does not apply to the facts in this case.[7]

Finally, whether the *Sotomayor* rule has any vitality at all is open to question in light of *United States v. Pforzheimer*, 826 F.2d 200 (2d Cir.1987). The *Pforzheimer* court held that federal rather than state law determined the admissibility of evidence obtained in a search conducted by state officials as part of a state investigation, even though the search was arguably improper under the state constitution. Although the court did not mention *Sotomayor*, it rejected as unpersuasive the argument which has generally been viewed as undergirding the *Sotomayor* rule. *See Eyerman* and *Jarabek, supra.* Noting appellant's claim that "if state law is not applied, a state prosecutor who is faced with evidence that might be suppressed in a state court prosecution may forum shop and instead use the federal courts," the *Pforzheimer* court observed that "[a] state prosecutor whose case relies on evidence that may be inadmissible in a state court trial has no power or authority to effect a prosecution in federal court. The initiation of a federal prosecution depends entirely on the discretion of the federal prosecutor." 826 F.2d at 204. It is therefore unclear whether the Second Circuit still recognizes the *Sotomayor* rule.[8]

For all of these reasons, Newberg's motion to suppress the OSMC/PNP tape recordings is denied.

### Motion To Suppress Seized Evidence

■ Pursuant to Rule 12(b)(3), F.R. Crim.P., defendants James S. Regan, Jack Z. Rabinowitz, Charles M. Zarzecki, Paul A. Berkman, and Smotrich move to suppress all of the evidence seized on December 17, 1987, at the Princeton, New Jersey offices of PNP and OSMC.

In Grand Jury proceedings, a former employee of OSMC, who worked there from about October, 1984, until about January, 1986, gave testimony implicating defendants in several violations of federal laws. On March 4, and December 17, 1987, defendant Smotrich gave extensive testimony before the Grand Jury about the operations

---

**7.** This conclusion accords with the oral decision of Judge Sand in *United States v. Jones,* 88 Cr. 824 (S.D.N.Y. oral decision Jan. 12, 1989) (Sand, J.). In *Jones,* another Drexel employee, Lisa Jones, is charged with perjury and obstruction of justice in connection with a grand jury appearance in January, 1988. She moved to suppress the very same tapes which defendant wants excluded in this case. Following oral argument in which defendant Jones relied on the same argument as defendant Newberg does in this action, Judge Sand held as follows:

All right, having read the briefs and having heard oral argument, I agree with the position taken by the government. I think that Cali-

fornia law would not preclude use of these conversations. Those policy reasons which in some circumstances lead a federal court to defer to state policies with respect to admissibility in evidence are not operative here and I deny the motion.

*Id.* at 25.

**8.** Judge Pollack noted in *Eyerman* that "despite the continued citation of *Sotomayor,* the Second Circuit has never actually applied state law to bar admission of evidence in a federal trial when federal law allowed the evidence to be admitted but state law did not." 660 F.Supp. at 780.

of PNP, OSMC and their affiliated organizations.

On December 17, 1987, Special Agent Morton Dick of the Internal Revenue Service ("IRS") applied to Magistrate John Devine of the United States District Court for the District of New Jersey for warrants to search OSMC's and PNP's business premises, located in Princeton, New Jersey. Subsequently, IRS Agent John Gallagher applied to Magistrate Devine for another warrant to search a warehouse where additional OSMC and PNP records were stored. A sworn affidavit of Agent Dick supported both applications.

In his affidavit, Agent Dick informed Magistrate Devine that he had learned about the information contained in the affidavit from the transcript of the Grand Jury proceedings, relying primarily upon the testimony of the former employee of OSMC, whose name he did not disclose, referring to the witness as "CS." Agent Dick related those parts of CS's testimony that described in considerable detail CS's first-hand observations of fraudulent transactions executed by PNA and Englewood involving "parking" of securities, transactions in which CS himself participated. As desciribed by CS, "parking" consisted of sales of securities with secret repurchase agreements for the purpose of creating bogus short-term capital loss deductions.

Magistrate Devine issued the warrants.[9] About thirty federal agents executed the warrant for searching the business premises of OSMC and PNP the same day, commencing the search about 1:00 p.m. and ending the search about 10:00 p.m. The agents seized several hundred boxes of records and other property, including audio tape recordings and thousands of documents. In the late afternoon, federal agents searched and seized property from the warehouse where other PNP and OSMC documents were stored, taking dozens of boxes of documents.

Defendants' first argument is that the warrants do not satisfy the Fourth Amend-

---

**9.** The warrants contained the following clauses:

1. Documents reflecting or recording the "parking" of securities—meaning the purchase or sale of securities subject to oral repurchase agreements—in or from the accounts of PNA, Englewood and any successor accounts in which PNP engaged in convertible bond and warrant hedging, for the period from January 1, 1984 through the present, including:
 a. Lists and summaries of "parked" securities positions; and
 b. Calendars, diaries and similar documents on which the agreed-upon repurchase dates of such securities were recorded.
2. Lists, summaries and recordings of securities trades and positions reflected on the books and records of PNP for the accounts of PNA, Englewood and any successor accounts in which PNP engaged in convertible bond and warrant hedging, for the period from January 1, 1984 through the present, including:
 a. Order tickets;
 b. Audio tape recordings of trades;
 c. Daily "trade sheets," position reports and "trading recaps"; and
 d. Periodic computer runs and other periodic reports.
3. Accounting, bookkeeping and tax preparation records and workpapers for PNA, Englewood, PNP and any successor partnership or entity in which PNP engaged in convertible bond and warrant hedging for the period from January 1, 1984 through the present.

4. Revenue rulings, memoranda and other materials on tax and securities law and regulations relating to convertible securities, wash sales, securities repurchase agreements, and requirements of generating and maintaining accurate records of securities trades and positions.
5. Correspondence between any principal or employee of OSMC or PNP with any one or more of the following persons:
 a. Bruce Newberg of Drexel Burnham Lambert;
 b. Lisa Jones of Drexel Burnham Lambert; and
 c. Barbara Geary of Merrill Lynch.
6. Rolodexes and other phone records of James Sutton Regan, Jack Rabinowitz, Charles Zarzecki and Paul Berkman.
7. Evidence of use of the mails in furtherance of the scheme to generate false and inflated federal income tax deductions for trading losses in the accounts of PNA, Englewood and any successor accounts in which PNP engaged in convertible bond and warrant hedging, for the period from January 1, 1984 through the present.
8. Evidence of use of interstate wire facilities in furtherance of the scheme to generate false and inflated federal income tax deductions for trading losses in the accounts of PNA, Englewood and any successor accounts in which PNP engaged in convertible bond and warrant hedging for the period from January 1, 1984 through the present, including telephone bills and other records of interstate telephone calls.

ment's requirement of particularity.[10] Parsing every clause of the warrants, defendants contend that some of the crucial terms of the warrants are too broad, too general, to pass the constitutional requirement that search warrants reasonably specify the places and things to be searched and seized. For example, defendants argue that the first six clauses fail to distinguish between evidence involving legal and illegal transactions, maintaining that the clauses therefore do not provide meaningful guidance to an executing agent about which items to seize and which items to leave undisturbed. Defendants also add that Clauses Five and Six fail to provide time guidelines. Clauses Seven and Eight, defendants contend, are too elastic to provide the constitutionally mandated guidance required by the Fourth Amendment.

The Fourth Amendment requirement of particularity is intended to prevent general warrants, general searches. "[T]he problem [posed by the general warrant] is not that of intrusion *per se*, but of a general, exploratory rummaging in a person's belongings.... [The Fourth Amendment addresses the problem] by requiring a 'particular description' of the things to be seized." *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). This requirement " 'makes general searches ... impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.' " *Stanford v. Texas*, 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1965) (quoting *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927)).

Nevertheless, the courts have recognized that executing agents must have as a practical matter "some discretion ... to interpret the words of every warrant no matter how particularly the items to be seized are described...." *United States v. Marti*, 421 F.2d 1263, 1268 (2d Cir.1970). The standard for constitutional particularity thus requires only that a warrant be "sufficiently

specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." *United States v. LaChance*, 788 F.2d 856, 874 (2d Cir.), *cert. denied*, 479 U.S. 883, 107 S.Ct. 271, 93 L.Ed.2d 248 (1986) (quoting *United States v. Vargas*, 621 F.2d 54, 56 (2d Cir.), *cert. denied*, 449 U.S. 854, 101 S.Ct. 150, 66 L.Ed.2d 68 (1980)); *cf. United States v. Ellison*, 793 F.2d 942, 947 (8th Cir.), *cert. denied*, 479 U.S. 937, 107 S.Ct. 415, 93 L.Ed.2d 366 (1986) ("Warrants are sufficient when they 'provide reasonable guidance to the exercise of informed discretion of the officer executing the warrant' ") (quoting *United States v. Faul*, 748 F.2d 1204, 1219 (8th Cir.1984), *cert. denied*, 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 632 (1985)); *United States v. Wuagneux*, 683 F.2d 1343, 1348 (11th Cir.1982), *cert. denied*, 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983) ("A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized").

Defendants cannot seriously maintain that the terms of the warrants that Magistrate Devine issued violate the above standards of particularity, which focus primarily on the effect of the terms of a warrant upon the agent, i.e., whether the agent can rationally understand and implement these terms. All of the clauses in the warrants should be readily comprehensible to a minimally trained federal agent, notwithstanding defendants' contentions to the contrary. A normal federal agent should not encounter undue difficulty in discerning documents "reflecting or recording the 'parking' of securities" (Clause One); order tickets, audio tape recordings of trades, daily trade sheets, or periodic computer runs (Clause Two); accounting, bookkeeping and tax preparation records since January 1, 1984 (Clause Three); revenue rulings, memos and other authorities on particular securities practices (Clause Four); correspondence with particular named individuals (Clause Five); rolodexes of particular individuals (Clause Six); or evidence of the use of the mails and wire facilities in fur-

---

**10.** Defendants couch their argument in different terms, using "overbreadth" instead of "particu-

larity," but the argument in substance is the same.

therance of a particular crime during a particular time period (Clauses Seven and Eight).

The Third Circuit in *United States v. Christine*, 687 F.2d 749 (1982), analyzed the particularity requirement similarly, focusing on the effect of the warrant on the executing agent, where the terms of the warrant extended more broadly than those in the instant case. In *Christine*, the government, pursuing the fraudulent procurement of government housing loans, obtained a sweeping warrant to search the premises of a target company. The warrant permitted the executing agent to search and seize:

> (a) all folders and all documents contained therein and all other documents relating to home improvements and home improvement contracts ... (b) all checks, check stubs and bank statements, deposit slips and withdrawal slips, reflecting the receipt and disbursement of funds through [defendant] ... (c) all general ledgers, general journals, cash receipt disbursement ledgers and journals for the period January 1, 1977 to the present; (d) all correspondence to and from and submissions to [another entity]; and (e) all other documents, papers, instrumentalities and fruits of the crime of submission of false statements in connection [with the loan program]

*Id.* at 751.

In spite of the sweeping authorization given to federal agents to take almost everything on the premises, Judge Becker stated unequivocally that the "warrant at issue cannot be invalidated as a general warrant for it does not vest the executing officers with unbridled discretion to conduct an exploratory rummaging throughout appellees' papers in search of criminal evidence." *Id.* at 753. The warrant provided lucid and easily implemented terms, albeit broad ones, describing "in both specific and inclusive generic terms what is to be seized." *Id.* Judge Becker emphasized that "by directing the searching officers to seize all of these items, the magistrate, *rather than the officer*, determined what was to be seized." *Id.* (emphasis added).

Similarly, in the instant case, the terms of Magistrate Devine's warrant are lucid and easily implemented, making the Magistrate the one who actually determined what was to be seized, rather than the agent. The lucidity of the terms left the federal agents, at best, with no discretion about what should be seized and, at worst, with the reasonable guidance necessary for the exercise of rational judgment that constitutes the practical standard of particularity.

Defendants' objections, however, may not derive from the effect of these general terms on the executing agents, but rather, from the effect of these general terms on them, that is, their privacy interests, regardless of how lucid these terms may be to the executing agents. The argument, although not couched strictly in terms of the language of traditional particularity doctrine, would be that the terms of the warrant are unjustifiably and excessively overinclusive, permitting the government access to much more of their property than the government should have.[11] Indeed, defendants' primary objections concerning

---

**11.** This argument smacks of the doctrine of overbreadth, i.e., insufficient probable cause to support the terms of the warrant. The argument, however, does not squarely fall within this doctrine. First, the doctrine of overbreadth concerns primarily the existence of probable cause for the terms in a warrant, independent of the generality of the terms. *See, e.g., Williams v. Kunze*, 806 F.2d 594, 598–99 (5th Cir.1986) (warrant for broad list of documents held sufficiently specific and "not overbroad since the description of the documents to be seized was not broader than what was justified by the showing of probable cause"). Second, the argument employs the language and analytical framework of the doctrine of particularity, usually casting itself in terms of warrants that are "too broad" and "too general." *See, e.g., U.S. v. Spilotro*, 800 F.2d 959, 963 (9th Cir.1986) ("In determining whether a description is sufficiently precise, we have concentrated on one or more of the following: (1) whether probable cause exists to seize all items of a particular type described in the warrant....").

The argument thus falls right in between the traditional doctrines of particularity and overbreadth, assuming facets of each—and thereby causing confusion and inconsistency in both. Nevertheless, the argument is a valid one and cannot be ignored.

**1112**

the generality of the terms of the warrants emphasize the absence of limitations that would make the terms of the warrants less overinclusive.[12] Defendants fault the warrants, and implicitly Magistrate Devine, for failing to tailor more precisely—or "particularly"—the terms of the warrant to the legitimate and justifiable needs of the government.

The court recognizes that the courts have unequivocally condemned warrants that fail to specify adequately what the government may search and seize and what it may not. *See, e.g., United States v. Leary*, 846 F.2d 592, 601 n. 15 (10th Cir. 1988) ("We emphasize that it is not the mere reference to the statute that makes the ... warrant overbroad, it is the *absence of any limiting features.* In other words, the warrant is limited neither by the list of records to be seized, nor by the reference to the export statutes.") (emphasis in original); *United States v. Cardwell*, 680 F.2d 75 (9th Cir.1982) (only limitation on search and seizure of target's business documents was reference to general tax evasion statute); *United States v. LeBron*, 729 F.2d 533, 539 (8th Cir.1984) ("The only limiting factor is the reference to 'stolen property'.... [T]his generic classification is not sufficient...."); *VonderAhe v. Howland*, 508 F.2d 364 (9th Cir. 1974) (no need for warrant for all of target's income and expense records when government only needed a few specific records and had already conducted complete audit of target's other financial records); *Voss v. Bergsgaard*, 774 F.2d 402, 405 (10th Cir.1985) ("Even to describe the warrant as limited to evidence relating to [all] federal crimes is an interpretation

generous to the government."); *Spilotro*, 800 F.2d at 965 ("In this case, however, the only limit on the search and seizure was the requirement that the items seized be evidence of a violation of any one of thirteen statutes, some of exceptional scope."); *United States v. Buck*, 813 F.2d 588, 592 (2d Cir.1987) ("The warrant only described the crimes—and gave no limitation whatsoever on the kind of evidence sought."); *Rickert v. Sweeney*, 813 F.2d 907, 909 ("the warrant on its face authorizes a general search limited only by references to the general conspiracy statute and general tax evasion statutes") (citations omitted).

The warrants in the instant case, however, pass constitutional muster, for four reasons. First, the warrants contain significant limitations on what the government may search and seize, providing substantial guidance to the executing agents, in contrast to cases where warrants have been deemed unconstitutionally vague and general. Clause One, *see supra* note 9, provides the subject of the documents to be searched, i.e., "parking", circumscribing dates and the involved parties. Moreover, Clause One provides two specific examples of the types of evidence Clause One covers. Clause Two gives three types of evidentiary materials (lists, summaries and recordings) and limits the warranted materials to a particular subject, securities trades and positions reflected on the books and records of PNP. Moreover, Clause Two supplies circumscribing dates and enumerates four specific examples of the material sought. Clause Three specifies three distinct categories of business documents and circumscribing dates.[13] Clause Four en-

**12.** For example, defendants argue that Clause One fails to distinguish between legal and illegal oral transactions; that Clause Two permitted the government to take lists of trades and positions "without regard to whether those records were evidence of or even marginally related to criminal conduct"; that Clause Three failed to distinguish between accounting and tax records involving legal transactions and those records involving illegal transactions; that Clause Four allowed federal agents to seize any resource material used in the conduct of business; that Clause Five did not limit the government to searching and seizing only those correspondences involving criminal activity or occurring with-

in a particular time period; that Clause Six did not link the subject rolodexes to criminality, a time period or business purposes; that Clause Seven and Eight failed to mention specific firms with which defendants may have traded or a narrower time period during which the mail and wire services had been abused.

**13.** The courts have regularly upheld warrants authorizing searches and seizures of broader categories of financial and transaction records than those in Clauses Two and Three. *See, e.g., United States v. Kail*, 804 F.2d 441, 444–45 (8th Cir.1986) ("accounting ledgers or records,

compasses only those resource materials related to the subjects crucial to the probable criminal activity. Clause Five limits the desired correspondence to exchanges with three named individuals. Clause Six specifies the rolodexes of four named individuals.[14] Clauses Seven and Eight limit the desired evidence of mail and wire fraud to that which involves a particular crime (generating false federal income tax deductions) and a particular source (trading losses). Moreover, Clauses Seven and Eight provide circumscribing dates.

■ Second, material evidence of criminal activity is not necessarily limited just to evidence describing the criminal activity, particularly in complex tax fraud cases. In order to reconstruct defendants' true financial and tax picture, evidence regarding legal as well as illegal transactions may be necessary to show a violation of federal tax laws and the extent of any possible violations. *See United States v. Frederickson*, 846 F.2d 517, 519—20 (8th Cir.1988) (to secure conviction of income tax evasion, government had to have evidence sufficient to reconstruct defendant's true income liability); *United States v. Hershenow*, 680 F.2d 847, 853 (1st Cir.1982) (warrant authorizing search and seizure of doctor's records depicting both legal and illegal practices held permissible "in order to get a complete picture of a patient's case"). Magistrate Devine's warrants authorizing federal agents to secure documents and other evidence relating to both legal and illegal transactions do not appear to be constitutionally infirm, precisely because the government may need the legal to discover and show the illegal.

■ Third, the complexity of the defendants' activities and suspected crimes diminishes the requisite threshold of particularity for satisfying the Fourth Amendment. The degree to which a warrant must state its terms with particularity varies inversely with complexity of the criminal activity investigated. *See, e.g., Wuagneux*, 683 F.2d at 1349 ("It is universally recognized that the particularity requirement must be applied with a practical margin of flexibility.... Accordingly, in cases such as the one before us involving financial transactions ... reading the warrant with practical flexibility entails an awareness of the difficulty of piecing together the 'paper puzzle.' "); *Christine*, 687 F.2d at 760 ("Courts must avoid a hypertechnical approach by heeding the admonition that 'the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract.... This flexibility is especially appropriate in cases involving complex schemes spanning many years that can be uncovered only by exacting scrutiny of intricate financial records."); *cf. Spilotro*, 800 F.2d at 963 ("The specificity required in a warrant varies depending on the circumstances of the case and the type of items involved."); *Leary*, 846 F.2d at 600 ("Even a warrant that describes the items to be seized in broad or generic terms may be valid 'when the description is as specific as the circumstances and the nature of the activity under investigation permit.") Given the highly sophisticated, complex financial transactions under investigation, Magistrate De-

---

checkbooks, monthly statements, cancelled checks, and deposit slips; ... inventory records ... customer files, client lists, letters and mailings from clients...."); *United States v. Lamport*, 787 F.2d 474, 476 (10th Cir.1986) ("financial records"); *United States v. Cantu*, 774 F.2d 1305, 1307 (5th Cir.1985) ("Federal income tax returns and related forms and documents; copies of Federal income tax returns and related forms and documents; workpapers used in the preparation of Federal income tax returns; logs, rosters, writings, records, notes, or other lists regarding Federal income tax returns claiming refunds...."); *Shaffer v. Wilson*, 523 F.2d 175, 177 (10th Cir.1975) ("The warrant authorized the search of [defendant's] office for fiscal and business records relating to his income and expenses.").

**14.** The courts have regularly upheld warrants authorizing searches for evidence of association between and among participants in a criminal activity. *See, e.g., United States v. Matias*, 836 F.2d 744, 747 ("books and other records containing the names, addresses and/or telephone numbers of narcotics purchasers and/or suppliers"); *Wuagneux*, 683 F.2d at 1350 n. 5 ("correspondence" between certain individuals); *United States v. Abrams*, 539 F.Supp. 378, 387 (S.D. N.Y.1982) (Stewart, J.) ("personal telephone and address notebooks, and other documents showing the identities of persons participating in the described offenses").

vine appears to have been justified for any broadness in the terms of his warrants.

Fourth, requiring the executing agents to separate evidence of legal transactions from evidence of illegal transactions, by limiting the terms of the warrants only to those materials involving the latter (as defendants argue should have been done), would have been impractical. As defendants state in an affidavit, agents took "hundreds of thousands of documents, records and other property." Greenberg Aff. at 5. If the search warrant had required the executing agents to first determine whether the seized materials related to one of the suspected criminal activities or could conceivably have assisted in proving one of the suspected criminal activities, they would probably still be on the premises now. Even a trained expert in finance, securities and federal income taxation could not have reasonably discerned on the spot which of the myriad documents would prove to be valuable to a possible government prosecution. To expect a regular federal agent, albeit normally trained, to do what a trained expert could not do contemplates beyond even the impractical.

The Second Circuit emphasized the importance of practicality in construing the particularity of search warrants in *United States v. Scharfman,* 448 F.2d 1352 (2d Cir.1971). In *Scharfman,* a truck loaded with several hundred furs was hijacked at gunpoint. Some months later, a reliable informant told the FBI that it could find the hijacked furs at two stores owned by defendant. A U.S. Commissioner subsequently issued, on the basis of affidavits from two FBI agents, a warrant to search for, *inter alia,* furs. When the executing agents searched the premises of the two stores, they expropriated large quantities of furs.

Defendant appealed from his conviction, arguing, *inter alia,* that the search warrants were insufficiently particular, converting the search into a general one. Judge Kaufman, writing for the panel, emphasized that:

> the futility of further particularization is clear in this case.... [I]f the searching

agents entered a specified location with thousands of garments on the premises but the warrant itemized only a few hundred which had been allegedly stolen, the task of identifying and seizing the specific garments would have required a legion of fur experts to perform the task in a reasonable period. As we said in another context concerning appropriate search warrant procedures, the Fourth Amendment requirements do not impose a burden on the executing officer "beyond his power to meet."

*Id.* at 1354 (citation omitted); *cf. Christine,* 687 F.2d at 760 ("warrants 'must be tested by courts in a commonsense and realistic fashion' ") (quoting *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965)); *Spilotro,* 800 F.2d at 962 ("Warrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible.")

■ Defendants' second main argument is that, independent of the facial particularity of the warrants' terms, Agent Dick's affidavit did not provide probable cause for the scope of these terms. Defendants argue that the time limitations contained in the several clauses of the warrants extended longer than the affidavit justified, because the affidavit depicted only eleven illicit transactions occurring within a fifteen-month timeframe, while the time limitations in the warrants' clauses spanned four years or more. Defendants further state that the warrants did not limit the search and seizure of materials to those pertaining to transactions with Drexel and Merrill, even though Agent Dick's affidavit mentioned transactions only with these two financial entities. Additionally, defendants contend that the affidavit provided no support for the inclusion of "successor accounts" into the warrants. Finally, defendants argue that Clause Five does not adequately limit the search for correspondence, because only a handful of people at PNP were knowledgeable about the illicit transactions under investigation.

The question the court faces, as a reviewing court, is whether Magistrate De-

vine "had a 'substantial basis for ... conclud[ing]' that probable cause existed." [15] *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). Magistrate Devine determined that Agent Dick's affidavit provided probable cause for concluding that the defendants were engaged in fraud sufficiently pervasive to justify the search and seizure of all of the materials described in the warrant, materials which admittedly pertained to transactions other than those precisely described in the affidavit.

The court affirms Magistrate Devine's decision for two reasons. First, a careful reading of Agent Dick's affidavit leaves the court with the distinct impression that the eleven sham transactions described therein were not isolated instances of fraudulent behavior. Rather, the defendants appear to have an established system, including even a network of cooperating individuals, for executing their allegedly bogus transactions.[16] Although the Dick Affidavit described with specific information only eleven fraudulent transactions, they served as detail and corroboration of the ongoing scheme about which CS testified before the Grand Jury, not as an exhaustive list of all the illegal transactions defendants had performed. Agent Dick's affidavit established substantially more than a "fair probability," *Gates*, 462 U.S. at 238, 103 S.Ct. at 2332 (standard for issuing warrant is "fair probability" that evidence of crime will be found on the premises), that defendants had engaged in other sham transactions besides those specifically described in the affidavit.

■ Second, the complexity of the suspected criminal activity under investigation requires a more flexible approach in reviewing the issuance of the search warrants. The courts widely recognize that the complexity of suspected criminal activity is inversely related to the harshness of the judicial scrutiny applied in reviewing the granting of search warrants investigating such complex activity. "Effective investigation of complex white-collar crimes may require the assembly of a 'paper puzzle' from a large number of seemingly innocuous pieces of individual evidence." *Wuagneux*, 683 F.2d at 1349. The United States Supreme Court acknowledged this inverse relationship in *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed. 2d 627 (1976), denying petitioner's argument that the descriptive terms of a search warrant were so broad as to make it a general warrant:

> Under investigation was a complex ... scheme whose existence could be proved only by piecing together many bits of evidence. Like a jigsaw puzzle, the whole "picture" of petitioner's false-pretense scheme ... could be shown only by placing in the proper place the many pieces of evidence that, taken singly, would show comparatively little. The complexity of an illegal scheme may not be used as a shield to avoid detection when the State has demonstrated probable cause to believe that a crime has been committed and probable cause to believe that evidence of this crime is in the suspect's possession.

*Id.* at 480 n. 10, 96 S.Ct. at 2748–49 n. 10. Like the government's task in *Andresen*, the government in the instant case faces a complex system of criminal activity that may require the piecing together of a "jigsaw puzzle" with "many pieces of evidence

---

**15.** The Second Circuit has elaborated upon the role of the reviewing court in this situation: [The court's review] should start with the proposition that the magistrate's finding of probable cause is entitled to substantial deference.... In fact, a search based upon a magistrate's determination will be upheld by a reviewing court on less persuasive evidence than would have justified a police officer acting on his own.... Further, the magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity of [the] warrant.... This is particularly true in close cases where doubts should be resolved in favor of upholding the warrant. *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983) (citations omitted).

**16.** For example, Agent Dick explained that defendants Berkman and Regan told CS that PNP had "ongoing relationships" with defendant Newberg, Barbara Geary at Merrill, and Lisa Jones, Newberg's assistant. *See* Dick Aff. at 5.

that, taken singly, would show comparatively little." Given this situation, the court finds little difficulty approving Magistrate Devine's warrants, even if they authorized the search and seizure of materials beyond what was pertinent to the specifically described transactions and parties in Agent Dick's affidavit.[17]

■ The defendants' third main argument is that, even if the warrant was constitutionally valid, its execution violated the Fourth Amendment. Defendants contend that the executing agents flagrantly disregarded the terms of the warrant, transforming an otherwise valid search into a general one and requiring suppression of all fruits of the search.

In *United States v. Heldt*, 668 F.2d 1238 (D.C.Cir.1981), the court did acknowledge that in some cases where executing agents flagrantly disregard the terms of an otherwise valid warrant, the entire fruits of the search should be suppressed. Elaborating this doctrine, the *Heldt* court explained:

> If in this case law enforcement officers had conducted a document search as if no limiting warrant existed, rummaging at will among defendants' offices and files, then the mere existence of a valid—but practically irrelevant—warrant for certain specified documents would not be determinative of whether the search was so unreasonable as to require suppression of everything seized.

*Id.* at 1259; *accord United States v. Medlin*, 842 F.2d 1194 (10th Cir.1988) ("When law enforcement officers grossly exceed

the scope of a search warrant in seizing property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant thereby requiring suppression of all evidence seized under that warrant.").[18]

Analyzing the facts in the case before it, however, the *Heldt* court refused to apply the doctrine:

> Defendants do show several instances where documents were seized outside the warrannt, but they do not demonstrate such flagrant disregard for the terms of the warrant which might make the drastic remedy of total suppression necessary. Absent that sort of flagrant disregard, the appropriate rule seems to be that where officers[s] seize some items outside the scope of a valid warrant, this by itself will not affect the admissibility of other contemporaneously seized items which do fall within the warrant.

*Id.*

Like the government agents in *Heldt*, the executing agents in the instant case did not display sufficient flagrancy in disregarding the terms of Magistrate Devine's warrants to justify suppressing the entire fruits of the searches. Even if defendants' allegations are accepted as true, they do not show the kind of egregious, callous, reckless conduct needed to suppress all of the evidence obtained. For example, defendants allege that only 69 of the 259 boxes the government seized from the PNP premises contained documents relating exclu-

---

**17.** Additionally, defendants try to argue that Magistrate Devine's warrants lacked probable cause for two other reasons: (1) the evidence upon which the warrants were based was stale; and (2) the informant whose testimony provided the heart of Agent Dick's affidavit was unreliable.

The court finds these arguments frivolous. Although Agent Dick's affidavit gave specific information about only eleven transactions ending in 1986, it did not intend to relate these eleven transactions as isolated instances of criminal activity never to occur again. Instead, these eleven transactions served as detail and corroboration for CS's testimony about a systematic scheme of fraud; consequently, Magistrate Devine was justified in concluding that evidence of criminal activity could still be found

on the premises of PNP two years later. Moreover, defendant Smotrich testified that PNP kept records "going back as far as 1984 and 1985" and that PNP "keep[s] more records than we have to ... as opposed to throwing them out." Dick Aff. at 16. As to the reliability of Agent Dick's informant, the court finds that CS's sworn testimony under oath before a Grand Jury provided more than enough grounds for Magistrate Devine to rely upon it.

**18.** Defendants cite *United States v. Rettig*, 589 F.2d 418 (9th Cir.1978), but this case is inapposite. The *Rettig* court suppressed the entire fruits of the evidence only because the court could not separate the legally obtained evidence from the illegally obtained. *See id.* at 423.

sively to entities entirely outside the scope of the warrant.[19]

■ To be sure, some of the materials the federal agents seized may fall outside the scope of Magistrate Devine's warrants, e.g., a menu from a Chinese take-out restaurant, but the appropriate remedy for the seizure of materials beyond the scope of a valid warrant is the suppression of only those materials. *Andresen,* 427 U.S. at 482 n. 11, 96 S.Ct. at 2749 n. 11; *National City Trading Corp. v. United States,* 635 F.2d 1020, 1026 (2d Cir.1980); *United States v. Dunloy,* 584 F.2d 6, 11 n. 4 (2d Cir.1978) ("the remedy with respect to any items exceeding the scope of the warrant would not have been invalidation of the search but suppression of those items").[20]

In addition to their challenge of the scope of the warrants and the search, defendants also move for supression of the evidence seized in the search on the grounds that the government improperly disclosed secret grand jury material in violation of Rule 6(e), F.R.Crim.P.

Rule 6(e)(2) prohibits the disclosure of grand jury proceedings by non-witnesses "except as otherwise provided for in these rules." Rule 6(e)(3) details the exceptions under which disclosures can be made.

Rule 6(e)(3)(A)(i) allows disclosure to "an attorney for the government for use in the performance of such attorney's duty," and this has been construed as limiting disclosure to "use by those attorneys who conduct the criminal matters to which the materials pertain." *United States v. Sells Engineering, Inc.,* 463 U.S. 418, 427, 103 S.Ct. 3133, 3139, 77 L.Ed.2d 743 (1983).

Rule 6(e)(3)(A)(ii) allows disclosure to "such government personnel (including personnel of a state or subdivision of a state) as are deemed necessary by an attorney for the government in the performance of such attorney's duty to enforce federal criminal law." Persons to whom such disclosure is made are prohibited from utilizing the disclosed material "for any purpose other than assisting the attorney for the government in the performance of such attorney's duty to enforce federal criminal law." Rule 6(e)(3)(B). In addition, "[a]n attorney for the government shall promptly provide the district court, before which was impaneled the grand jury whose material has been so disclosed, with the names of the persons to whom such disclosure has been made, and shall certify that the attorney has advised such persons of their obligation of secrecy under this rule." *Id.*

Defendants contend that it was improper under these rules to disclose grand jury material to Magistrate Devine without first obtaining a court order from the Southern District of New York permitting such disclosure.[21]

---

**19.** This means that nearly three-quarters of all the boxes seized contain at least some documents falling within the scope of the warrant. This degree of accuracy does not reveal the kind of flagrant disregard necessary to consider suppressing all of the evidence obtained, particularly since this percentage figure would inevitably rise if the government's definition of what legitimately falls within the scope of the warrant were used.

**20.** Defendants also argue that the court should suppress a cassette recording discovered in defendant Regan's office, contending that the agent who listened to the cassette recording exceeded the scope of the search warrant in doing so.

The warrant, however, specifically authorizes the executing agents to search and seize "audio tape recordings of trades," justifying the agent's review of the cassette to discover whether it actually fell within this category. That the agent decided not to seize the tape does not

invalidate the initial search, because, as the United States Supreme Court has noted, "it is certain that some innocuous [records] will be examined, at least cursorily, in order to determine whether they are, in fact, among those ... authorized to be seized." *Andresen,* 427 U.S. at 482, 96 S.Ct. at 2749.

Neither can Magistrate Devine be faulted for not limiting the search for audio tape recordings of trades exclusively to the reel-to-reel tapes in the trading room of PNP. Understanding that PNP made it a practice to record their trade transactions on tape, Magistrate Devine could reasonably conclude that other tapes might also contain recordings of trade transactions.

**21.** Rule 6(e)(3)(C)(i) permits the disclosure of grand jury material that is otherwise prohibited "when so directed by a court preliminarily or in connection with a judicial proceeding." Application for such an order must be filed in the district where the grand jury convened. *See* Rule 6(e)(3)(D) and (E).

Defendants further contend that the government violated Rule 6(e)(3)(A) and (B) when Agent Dick, to whom disclosure had been properly made pursuant to Rule 6(e)(3)(A)(ii), disclosed that material to Agent Gallagher for purposes of obtaining the second search warrant. Defendants claim that Agent Dick's disclosure of grand jury material to Agent Gallagher was made without the prior authorization of government attorneys, and that the government also failed promptly to provide Gallagher's name to the district court as required by Rule 6(e)(3)(B).

Finally, defendants contend that the government violated Rule 6(e) when it made application to Magistrate Devine to unseal the affidavits used to obtain the December 17 search warrants. At a proceeding before this court on August 11, 1988, defendants asked the government to "produce" the search warrant affidavits so that defendants could prepare a motion to suppress. The government agreed to do this and applied to Magistrate Devine to unseal the affidavits. This was done, and the documents became available to the public. Defendants contend that the government should have requested that the affidavits be produced only to the defendants and not made generally available.

The government contends that it acted properly in all three instances cited by defendants. With respect to its disclosure of grand jury material to Magistrate Devine, the government argues that a common sense construction of Rule 6(e)(3)(A)(i) requires that government attorneys be granted some latitude in disclosing grand jury material where necessary to perform their prosecutorial duties.

Within bounds, such authority does exist. In an unreported opinion issued under seal by Judge Kram, Rule 6(e) was held not to prohibit the government's limited disclosure in open court and without prior authorization of information regarding an ongoing grand jury investigation for the purpose of explaining its reasons for making certain motions. *In the Matter of an Application by Robert M. Freeman and Timothy L. Tabor Relating to Certain Grand Jury Matters*, M 11–189 (S.D.N.Y. July 8, 1987) [1987 WL 13738] (Kram, J.). The court reasoned that Rule 6(e) "permit[s] disclosure by government attorneys of grand jury material, when the disclosure is made in the course of their prosecution of the case." *Id.* at 10.

Also, even before Rule 6(e) was amended to sanction the practice expressly, *see* Rule 6(e)(3)(C)(iii), courts sometimes allowed disclosure of the minutes of one grand jury to another grand jury without prior court approval. In upholding such disclosure where the second grand jury was investigating possible perjury committed before the first grand jury, the Second Circuit reasoned as follows:

> There has never been any question of the right of government attorneys to use grand jury minutes, without prior court approval, in preparation for trial and even to make them public at trial to the extent of referring to such minutes during the examination of witnesses. If government attorneys have the right to use grand jury minutes to the extent of making them public during a trial, without court approval, it is certainly no less a proper performance of their duties to use them without court approval before another grand jury where the proceedings are secret and the purpose is the enforcement of the perjury and false statement statutes.

*United States v. Garcia*, 420 F.2d 309, 311 (2d Cir.1970) (citation omitted).

However, in *United States v. Malatesta*, 583 F.2d 748, 752–54 (5th Cir.1978), the Fifth Circuit held that pre-indictment disclosure of a grand jury's minutes to a second grand jury is permitted only in the *Garcia* situation, that is, where the proceedings before the first grand jury are the predicate for a perjury indictment.

Other circumstances in which the government's disclosure of grand jury material without prior approval have been upheld include submissions at a Rule 11 hearing,[22]

**22.** Rule 11, F.R.Crim.P., establishes procedures for a district court to follow before accepting a

provided "the material introduced is relevant to the question of guilt or if it will assist the Court in sentencing the defendant," *United States v. Manglitz*, 773 F.2d 1463, 1467 (4th Cir.1985), and at trial to refresh the recollection of government witnesses or to impeach witnesses. *See* 1 Wright, Federal Practice & Procedure: Criminal § 107 (2d ed. 1982) and cases cited thereat. It is doubtful, though, whether the government's authority to disclose grand jury material in open court without prior authorization extends to circumstances where "there is no requirement that the court consider only evidence adduced in open court." *United States v. Alexander*, 860 F.2d 508 (2d Cir.1988).

Defendants place considerable reliance on *Alexander*, citing the court's holding that a sentencing court "may appropriately authorize the government to disclose to it grand jury materials for its use in considering what sentence to impose." 860 F.2d at 513. Defendants argue that this evidences the court's view that such an order is necessary if a sentencing court is to be provided with grand jury material. In fact, that question was not before the court. The issue presented for decision was whether it was proper for the government to seek and for the court to permit the disclosure of such material in open court. The procedure expressly approved in *Alexander* is for the government to "state its sentencing position in open court in terms that do not reveal matters that occurred before the grand jury, furnishing the supporting grand jury material to the court in a sealed filing." *Id.* at 514. The court does not indicate whether the government must obtain prior approval from the district court where the grand jury convened before making such a filing.

Even though *Alexander* is not dispositive in favor of defendants' position, it underscores the importance of the secrecy requirement of Rule 6. It also suggests that the unreported opinion of Judge Kram cited above should be construed narrowly, at least with regard to disclosures made in open court.

■ However, where a non-public disclosure of grand jury material is made to a federal court in connection with a government attorney's conduct of the criminal case to which the materials pertain, there is little point in requiring prior court approval of the disclosure. The reasons ordinarily cited for safeguarding the confidentiality of grand jury proceedings primarily relate to the possible consequences of disclosure to the public.

> First, if preindictment proceedings were made public, many prospective witnesses would be hesitant to come forward voluntarily, knowing that those against whom they testify would be aware of that testimony. Moreover, witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements. There also would be the risk that those about to be indicted would flee, or would try to influence individual grand jurors to vote against indictment. Finally, by preserving the secrecy of the proceedings, we assure that persons who are accused but exonerated by the grand jury will not be held up to public ridicule.

*Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 218–19, 99 S.Ct. 1667, 1672–73, 60 L.Ed.2d 156 (1979); *cf. Sells*, 463 U.S. at 431–34, 103 S.Ct. at 3142–43. It is these concerns which the *Alexander* court cited in explaining why the public disclosures made in that case were improper. *See Alexander*, 860 F.2d at 513.

In *Malatesta*, the additional concern was expressed that permitting disclosure of material from one grand jury to another without prior court approval could result in "possible prosecutorial abuse, such as the use of selected portions of the testimony, or the presentation of a transcript when the witness in person would be unimpressive," *Malatesta*, 583 F.2d at 753, yet Rule 6(e)(3)(C)(iii) now expressly allows such disclosure.

---

guilty plea. A Rule 11 hearing is designed to ensure that a defendant's guilty plea is voluntary and that he understands the charges against him.

None of these concerns are implicated when a non-public disclosure of grand jury material is made to a federal court in the course of criminal proceedings related to the material. It therefore seems unlikely that Congress intended Rule 6(e) to prohibit such disclosures without a prior court order. The conclusion therefore follows that the government did not violate Rule 6(e) in disclosing grand jury material to Magistrate Devine.

■ Moreover, since the concerns that undergird Rule 6(e) focus on the integrity of the grand jury process rather than the rights of persons subjected to searches and seizures, it is doubtful that defendants have standing to invoke the rule for the purposes of this motion. Defendants' injury appears not to be within the zone of interests which Rule 6(e) seeks to protect. *See* 13 Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction 2d §§ 3531.7, 3531.16 (1984).

■ This consideration also bears on the issue of whether the relief sought by defendants would be an appropriate remedy for a Rule 6(e) violation in any case. If Agent Dick disclosed grand jury material to Agent Gallagher without the knowledge or authorization of government attorneys, a violation of Rule 6(e)(3)(A)(ii) did occur. If the government subsequently failed promptly to notify the court that Gallagher was among the people authorized to receive the material at issue, a violation of Rule 6(e)(3)(B) occurred.

Since the government does not concede either claim, fact finding would be required for the court to decide whether the alleged violations occurred. However, assuming for the sake of argument that defendants' allegations are true, it does not follow that the fruits of the December 17 search should be suppressed. Rule 6(e)(2) provides that "[a] knowing violation of Rule 6 may be punished as a contempt of court." This language is permissive rather than exclusive, *United States v. Coughlan,* 842 F.2d 737, 740 (4th Cir.1988), but in most cases, enforcement of Rule 6(e) may be adequately secured by a contempt citation. *Malatesta,* 583 F.2d at 753.

There is certainly no support in the cases upon which defendants principally rely for their contention that the remedy they seek is an appropriate one for the Rule 6 violations they have alleged. In *Alexander,* the court refused to vacate appellant's sentence even though it found that both the government and court violated Rule 6(e) when public disclosure of grand jury material was permitted in connection with appellant's sentencing hearing. The court reasoned that it was not improper for the court to have considered the grand jury material at issue. It was merely improper for that material to have been made public. Since the public disclosure did not have any improper effect on the sentencing, it provided no grounds for overturning the sentencing court's decision. *Alexander,* 860 F.2d at 514–15.

Similarly, in *Malatesta,* the court refused to dismiss an indictment even though the grand jury had been improperly provided with material from another grand jury proceeding. The court reasoned that "the short-cut taken by the prosecutor was a trespass, but it did not impair any substantial rights of the defendants or impugn the integrity of the grand jury proceedings." *Malatesta,* 583 F.2d at 754.

Defendants do not contend that it would have been improper for government attorneys to authorize disclosure of the grand jury material to Agent Gallagher, only that they failed to do so. If defendants' allegation is true, the disclosure was improper, but it cannot be said that defendants thereby suffered any impairment of their substantive rights. Based on the facts of this case, the suppression of evidence seized in the December 17 search would be an inappropriate remedy for the government's alleged misconduct.

The same reasoning applies with even greater force to the allegedly improper application made by the government to unseal the affidavits submitted by Agents Dick and Gallagher. The application to unseal the documents was made almost eight months after the search. Even if improper, it does not provide grounds for invalidating the search.

It is therefore unnecessary for the court to make a determination as to whether disclosure of grand jury material to Agent Gallagher or the government's application to unseal the affidavits violated Rule 6(e). Defendants' motion fails in any case. For similar reasons, it may not have been necessary to determine whether the disclosure to Magistrate Devine violated Rule 6(e), but given the greater importance of that disclosure to defendants' position, a determination of the issue is deemed appropriate to ensure full consideration of defendants' claims.

#### Motion To Compel Discovery

Defendants have filed a motion seeking discovery of various matters. The motion is flawed because it is boilerplate, rather than discrete, and because it overreaches.

Some things are being demanded that counsel knows will not be secured, e.g., "exploration of the grand jury proceedings to determine whether irregularity occurred, or copies of all indictments ... disciplinary, licensing, tax, customs or immigration proceedings brought by [any authority] ..." of members of a witness' immediate family. The law is very clear about the shield erected to protect grand jury proceedings against disclosure, and there will be no probing into the lives of a witness' family in this case, except on a showing that such probing is mandated to establish a matter essential to a proper defense against these charges.

Requests in paragraphs I and II seek discovery of various matters before the grand jury. Defendants seek to justify those requests as "a predicate to motions under Rule 6(d) and Rule 6(e) [, F.R.Crim. P.]." That argument has no merit since, as has been pointed out at an earlier point in this opinion, it is doubtful that a defendant is the intended beneficiary of the stringent secrecy requirements Rule 6 imposes. Moreover, defendants proceed under two conflicting theories. They contend, on the one hand, in their motion to suppress because of Rule 6 violations, that the government has violated Rule 6 by unauthorized disclosures and that the indictment is tainted and on the other hand seek unauthorized disclosures through these discovery requests so they will not have to move to suppress because of earlier unauthorized Rule 6 disclosures. In my view, neither position has merit.

▉ The law is clear that something more than counsel's unsupported conjecture that something amiss took place is needed before the veil screening grand jury activity from public scrutiny can be lifted. *See, e.g., United States v. Bari,* 750 F.2d 1169, 11-76 (2d Cir.1984) ("grand jury proceedings ought not be viewed as fertile ground to be eliminated for evidentiary or other error"); *United States v. Kalevas,* 622 F.Supp. 1523, 1525 (S.D.N.Y.1985) (Weinfeld, J.) ("An indictment, valid on its face, returned by a legally constituted and unbiased grand jury is all that is required by the Fifth Amendment"). The motion as to these items is summarily denied.

Requests in paragraphs III and IV. The government is required to provide each defendant with his prior criminal record, if any, in the government's possession. It is not required, at this time, however, to articulate which such acts it intends to rely on at trial. I am going to require the government to provide defendants with a list of its witnesses a reasonable time before trial, and during trial a schedule of the order in which it will call its witnesses. While I believe it will help speed the trial if all information, that need not be withheld for reasons of trial strategy or to protect a witness, is supplied to defendants a reasonable time in advance of trial, I see no need for such information to be afforded this far in advance of trial.

All of these items go to the testimony of witnesses and can be postponed until the government has had the opportunity to be well advanced in its own trial preparation. Unlike the matters discussed in open court Wednesday, February 1, 1989, which go to the theory of the government's case and which defendants should be apprised of as early as possible to prepare their case in opposition, these matters have no present urgency.

 Requests in paragraph V for the items listed in (a), (b), (c), (g), (h), (i), (j), (k), (*l*), (m), (n), (*o*), (p), (q), (s), (t) are, as prior requests, at best premature, and, in some cases, probably not subject to discovery in any event. As indicated, items (e) and (f) as to members of a witness' family will certainly be denied without the articulation of a justifiable and overwhelming need for such information.

Items (d) and (r) refer to the government's obligation to provide defendants with all exculpatory information in its possession. I have no reason to anticipate that the government's obligation in this respect will not be fulfilled. However, the government should fulfill its obligation in this regard without undue delay and advise defendants whether such exculpatory information is in the government's possession. Obviously, if it does possess such information, it should be turned over to defendants immediately.

Perhaps the court is responsible for this boilerplate style motion being made. Defendants may have been misled into believing that such an all inclusive motion was necessary to preserve their rights to more discrete discovery as trial preparation begins to become more urgent as the June 5 date gets closer. Nonetheless, even if filed to protect the record, these kinds of motions are a waste of counsel's and the court's time.

The government should begin promptly to supply defendants with all discovery materials to which defendants are entitled. Discovery to which defendants are entitled but denied as premature should be supplied as soon as possible, consistent with the government's trial strategy. While the government has the right, for example, pursuant to the Jenks Act, to withhold a witness' statement and impeachment materials it possess until after the witness' direct testimony, generally this tactic results in delaying the course of the trial, without any significant benefit to the government. Indeed, this could result in prejudicing the jury against the government. In a case such as this, there will be few surprises. Thus, the court strongly suggests that the government hold back what it must essentially give up only that which is prudent to withhold in terms of its prosecutorial objectives.

I believe this more or less general statement is the most efficacious way to deal with this all inclusive discovery motion. The government should begin promptly to supply what it is required to supply and give defendants a date when the other discoverable material requested will be made available. If this is done by mid-to late March, there should be very few discoverable items that will have to be resolved, and they would be specific matters that should be readily resolved with the court's assistance.

While I am going to insist that the government provide discovery sooner rather than later, I remind defendants of their mutual Rule 16, F.R.Cr.P., obligations. While defendants are generally very vociferous that their discovery demands be met immediately, they become vague and ambiguous about fulfilling their discovery obligations to the government. I trust that will not happen in this case.

## CONCLUSION

Defendant Smotrich's motion to suppress his grand jury testimony is denied. Defendant Newberg's motion to suppress certain tape recordings is also denied. The motion of Defendants Regan, Rabinowitz, Zarzecki, Berkman, and Smotrich to suppress evidence seized by the government in its December 17, 1987, search is also denied. Defendants motion to compel discovery is disposed of as indicated in the body of the opinion.

IT IS SO ORDERED.