**UNITED STATES of America**

v.

**Javier RODRIGUEZ, Jose Miguel Ortiz**

**No. 2:00–CR–120–02.**

United States District Court,
D. Vermont.

July 19, 2001.

Barbara E. O'Connor, AFPD, Office of the Federal Public Defender, Districts of Northern New York & Vermont, Burlington, for Javier Rodriguez, defendants.

John M. Conroy, AUSA, Office of the United States Attorney, District of Vermont, Burlington, for U.S. Attorneys.

## *OPINION AND ORDER*

SESSIONS, District Judge.

Defendant Javier Rodriguez ("Rodriguez") has moved to suppress all evidence seized as a result of telephone calls monitored by the police, claiming that such monitoring was unlawful. Defendant Jose Miguel Ortiz ("Ortiz") moves to suppress all evidence because, as he alleges, the police illegally stopped his car and arrested him without probable cause. For the reasons that follow, both motions to suppress (Papers 14 and 24) are **DENIED.**

### I.  Facts

On April 28, 1999, a young man by the name of Jamie Spagnola ("Spagnola") was arrested for drug trafficking in Burlington, Vermont, by Detective Corporal John C. Lewis ("Lewis") of the Burlington Police Department. Immediately following Spagnola's arrest, his case was accepted for federal prosecution. He was promptly indicted and arraigned in federal court on April 29, 1999.

After his arrest, Spagnola immediately began cooperating with authorities. Accordingly, Spagnola informed Lewis that he had been acquiring heroin on about three or four occasions a month (and had acquired 400 bags the day before his arrest) from a Hispanic male in Holyoke, Massachusetts, he knew as "Javier" or by the nicknames "Javy" and "Cake," (who turned out to be Rodriguez, one of the defendants in this case). Spagnola provided Lewis with a description of Rodriguez, a pager number and another telephone number that he had used to contact Rodriguez. Spagnola also advised Lewis that Rodriguez had a motorcycle and a white

four-door car, and that he believed Rodriguez had a storage unit, although he was not sure where it was.[1] Lewis traced the home telephone number that Spagnola provided to an unknown woman at 31 West Court, a public housing development in Holyoke.

Lewis then contacted Detective Gary Gresh ("Gresh") of the Holyoke Police Department with this information. Gresh went to 31 West Court and found a white Geo nearby on an adjacent street. The license plate number of the Geo came back to Rodriguez. Directly behind the Geo, Gresh also observed a motorcycle covered with a tarpaulin. Although Gresh could not view the plate number on the motorcycle, he noted that the motorcycle had fluorescent orange wheels. Gresh then relayed all of this information to Lewis.

When authorities realized that Spagnola was probably not going to be eligible for pre-trial release, they developed an investigative plan whereby Spagnola, while in custody, would page Rodriguez to arrange a purchase of heroin in Holyoke. Through the use of a call-forwarding device, it would appear to Rodriguez that Spagnola's calls were originating from a Massachusetts telephone number. Similarly, any call Rodriguez might attempt to return to that number would be forwarded to investigators in Vermont. Rodriguez would thereby believe that Spagnola was in Massachusetts, ready to consummate a purchase. Spagnola agreed to participate in executing this plan.

On May 3, 1999, authorities put this plan into effect by having Spagnola place a call to the home telephone number he gave them for Rodriguez, using a device placed in Spagnola's ear which was attached to a small hand-held recorder, to record both sides of the conversation. On that first call, Spagnola left a message for Rodriguez, suggesting that he would be coming to Massachusetts in a few days to acquire more heroin.[2] On May 4, Spagnola called Rodriguez again, once leaving another message and a second time speaking directly to Rodriguez. During that conversation, Rodriguez agreed to meet Spagnola on May 6.[3]

On May 6, Lewis paged Rodriguez twice. Following the second page, at approximately 2:55 p.m.,[4] Rodriguez called back; his call was forwarded by the Springfield DEA call forwarding equipment to the United States Marshal's office in Burlington, where Spagnola answered. Spagnola told Rodriguez that he was in town and needed "about 40." *See* Tr. of calls at 4. They agreed to meet on the Mount Tom access road about 25 minutes later.

1. Spagnola never definitively connected Rodriguez's storage unit to any drug activity. According to Lewis, Spagnola said it would not have surprised him if it was used for drugs, but he did not have any knowledge that it was.

2. The word "heroin" was never used during any of the calls. Instead, Spagnola referred to his "subscription," which was his "key word" for heroin. *See* Tr. of Hr'g at 29, 57 [hereafter, "Tr."].

3. When Spagnola asked him if he would be driving his white car, Rodriguez told him no, that he would be driving "something else." *See* Tr. of calls at 6 (Paper 32, Ex. 2). After the call, when authorities were trying to figure out what car Rodriguez might be arriving in, Spagnola recalled that he might also have a "Toyota Low–Rider." *See* Tr. at 36.

4. At the end of the call, Lewis stated that the call was received at approximately 15:55 hours (or 3:55 p.m.). Lewis testified in the hearing, however, that he had misstated the time, and that the call was actually received around 2:55 p.m.

Each of the communications between Rodriguez and Spagnola was recorded. Moreover, Spagnola was aware of and consented to the recording of each of the calls before they were made. Spagnola's lawyer was also aware of, and consented to, this cooperation by his client.

After the meeting was arranged with Rodriguez, Burlington authorities relayed the results of the call to the Holyoke Police Department and the Springfield DEA. DEA Special Agent John Dudley ("Dudley") had already established a surveillance at ABC Mini Storage[5] at 621 South Canal Street in Holyoke. He was parked next to the storage facility, at a Shell service station, such that he could see the entrance to the facility and one row of the storage units. At about 2:10, or approximately 45 minutes before Spagnola and Rodriguez set up their alleged meeting, Dudley saw someone on a blue motorcycle with "orange trim and orange rims" drive into the storage facility and drive up to one of the units on the side that he could see, from a distance of about 100–120 feet. Tr. at 64, 77–78. Dudley had been told to be on the lookout for a vehicle matching that description.

The rider dismounted the vehicle, unlocked the unit, and put the motorcycle inside.[6] In the meanwhile, a small red Toyota hatchback with a bicycle rack on the back[7] pulled up to the unit and parked. As the driver of the Toyota got out and got into the passenger side, the rider of the motorcycle came out of the unit, locked it, and got into the driver side of the Toyota and drove away. Although Dudley could not identify him at the time, after the defendants were arrested, Dudley was able to identify the person who drove the Toyota into the facility (and left as the passenger) as Ortiz, by his build, hair, clothing, and a tattoo on his right bicep.[8] Dudley was never able to positively identify the motorcycle rider.[9]

Dudley relayed his observations to his colleagues at the DEA. He also learned from his colleagues that Spagnola had spoken with Rodriguez at 2:55, and that they had set up a deal on the mountain access road.

At 3 p.m., while Dudley was still at the same location surveying the storage site, a different, reddish Toyota[10] containing two people pulled in to the storage facility. The driver of that vehicle—whom Dudley recognized as the same individual from the previous visit, later identified as Ortiz—got out and opened the storage unit and went in. After two or three minutes, he exited and locked the unit, got into the car and

5. Although Spagnola did not know the location of Rodriguez's supposed storage unit, the Massachusetts authorities had discovered that an associate of Rodriguez, William Guilbe, had a unit at ABC Mini Storage, which was why Dudley had been assigned to watch it. (Moreover, another officer testified that there are only two storage facilities in Holyoke.)

6. Although Dudley had a clear enough view of the unit to see which number it was, he could not see into the interior of the unit.

7. Dudley recalled that the license plate on this Toyota was from Massachusetts and that the license number was 1338GJ.

8. As the car exited the storage facility, it came within approximately twenty feet of where Dudley was stationed, facing the passenger side of the car, and Ortiz's arm (with the tattoo on it) was placed up on the open window.

9. Dudley testified that he did not get a good look at the motorcycle rider and that he had never seen either of the two people who first arrived at the storage facility before. He also testified that at that time, he had not seen a picture of Rodriguez and did not know what he looked like.

10. This Toyota, Dudley recalled, had a license number of 7743KI.

drove away. The passenger, who was wearing a baseball cap, never exited the vehicle. Dudley again communicated these observations—including a description of the vehicle, the registration number, the number of occupants of the vehicle, and the fact that the driver was the same as the one who had driven the first vehicle to the site—to his colleagues at the DEA.

The DEA and the Holyoke Police Department do not share the same radio frequency. However, Kevin Thomas ("Thomas"), a DEA Task Force agent who participated in the arrests of the defendants, had access to both a DEA radio and a Holyoke Police Department radio on that day. As such, he was able to—and did—relay information obtained by Special Agent Dudley to the other police officers who participated in the arrests.

Once they learned of the designated meet site, Thomas positioned himself with several other officers from both the Holyoke Police Department and the DEA in a parking lot at a housing complex just below the dirt/gravel parking area at the top of the access road (where Rodriguez thought he was to meet Spagnola). Another DEA Agent, Misael Rodriguez ("Agent Rodriguez"), took a position in the woods along the roadway. Shortly after the officers took their positions, Agent Rodriguez radioed Thomas and the other officers to inform them that a Toyota with a bike rack matching the description given by Dudley was coming up the road with one occupant inside of it. After it passed the position where Thomas and the other officers were stationed, the officers followed the car, stopped it, and arrested the occupant, who turned out to be Rodriguez. The license plate of the car matched that of the first Toyota that Dudley had observed at ABC Mini Storage.

While the officers were in the process of taking Rodriguez into custody, Agent Rodriguez radioed Thomas stating that a vehicle matching the description of the second Toyota observed by Dudley that day was coming up the access road with two occupants inside.

The officers attempted to hide Rodriguez so that the occupants of the second vehicle would not see that he had been taken into custody. Then, they allowed the vehicle to proceed to the top of the access road, to the parking area, turn around, and begin to head back down, at which point they "set upon" the second vehicle and arrested the occupants. *See* Tr. at 99, 101. The operator of that vehicle was Ortiz. On the floor of the passenger side under a towel and wrapped in a sweatshirt, the officers found 41 bundles (or 410 bags) of heroin. The license plate of the vehicle driven by Ortiz was the same as the second Toyota reportedly seen by Dudley earlier in the day.

The officers then obtained a search warrant from Holyoke District Court for unit 40 (the unit that Dudley observed the motorcycle rider and Ortiz entering on the day of the arrests) at ABC Mini Storage, where they seized an additional 30 bags of heroin.

Ortiz and Rodriguez were indicted in state court in Massachusetts. The state court judge granted a motion to suppress by the two defendants, because the Commonwealth failed to present any evidence that Spagnola was aware of or consented to—either implicitly or explicitly—the recording of the calls. The state charges were then dismissed. Thereafter, Rodriguez and Ortiz were indicted in federal court in Vermont for conspiracy to distribute heroin.

## II. Arguments

The Court held a hearing on the motions to suppress on May 21, 2001, and, in addi-

tion to the substantial briefing submitted to the Court prior to the hearing, the parties filed post-hearing supplemental briefs.

## A. Rodriguez

Rodriguez makes two principal arguments in support of his motion to suppress. First, he argues that the monitoring of the telephone conversations between Spagnola and Rodriguez was unlawful under 18 U.S.C. § 2511(2)(c) because Spagnola did not consent to such monitoring. After the government elicited testimony from Spagnola that he was aware of and consented to the recording, however, Rodriguez shifted his argument, and asserted instead that because Spagnola was in the process of withdrawing from heroin, he was unable to *meaningfully* consent to the recording.

Second, Rodriguez argues that even if the government's monitoring did not violate 18 U.S.C. § 2511(2)(c), the evidence should be suppressed because the recording of Spagnola's conversations with Rodriguez violated Vermont law.[11] Rodriguez argues that allowing the application of federal law (assuming that § 2511(2)(c) was not violated in this case) "in order to by-pass clearly enunciated state constitutional prohibitions on such conduct would encourage forum shopping." Mot. to Suppress Evid. at 3 (citing *United States v. Sotomayor,* 592 F.2d 1219, 1224–26 (2d Cir.1979)).

Because the monitoring of the phone calls was unlawful, Rodriguez asserts, all of the evidence obtained in the case, including the heroin found in the car operated by Ortiz, the heroin found in the storage unit, and any statements made by Rodriguez, must be suppressed as fruit of the poisonous tree.

In opposition to Rodriguez's motion to suppress, the government argues, first, that Rodriguez lacks standing to contest the seizure of the heroin found in Ortiz's car and in the storage unit. "To mount a challenge to a search of an automobile, a defendant must show, among other things, a legitimate basis for the asserted privacy interest." Gov't's Resp. to Def.'s Mot. to Suppress at 4 (Paper 20) [hereafter, "Gov't's Opp'n to Rodriguez's Mot."] (citing *United States v. Ponce,* 947 F.2d 646 (2d Cir.1991)). Because Rodriguez has failed to present any evidence as to why he has any interest in the storage facility or the vehicle operated by Ortiz (as is his burden), the government contends that his motion to suppress must be denied.

Second, the government argues that federal law must be applied in federal criminal cases under *United States v. Pforzheimer,* 826 F.2d 200 (2d Cir.1987), and that because Spagnola consented to the recording of the phone calls, the government complied with the applicable federal statute. The government further argues that the language in *Sotomayor,* 592 F.2d 1219, upon which Rodriguez relies for his forum shopping argument, was dicta, and was eviscerated by later Second Circuit precedent. *See* Gov't's Opp'n to Rodriguez's Mot. at 6–7 (noting that *United States v. Workman,* 80 F.3d 688 (2d Cir. 1996), held that "there is simply no requirement that for evidence to be admissible in a federal case a state official must have conformed to state standards"); *see also id.* at 7 ("In so holding, the *Workman* court noted that its decision was 'at odds' with *Sotomayor,* yet consistent with all subsequent Second Circuit cases analyzing the issue . . . .").

---

**11.** In *State v. Blow,* 157 Vt. 513, 602 A.2d 552 (1991), the Vermont Supreme Court held that warrantless electronic monitoring of a defen-

dant's conversations conducted in a home offends core values of the Vermont Constitution. *See id.* at 519, 602 A.2d at 556.

## B. Ortiz

In support of his motion, Ortiz argues that the police did not have probable cause to stop his car and arrest him, and that therefore, all of the evidence in the case against Ortiz is "fatally tainted" and must be suppressed. *See* Def. Ortiz Mem. of Law in Supp. of Mot. to Suppress Evid. at 3 (Paper 26).

The government argues that given the collective knowledge of the police officers regarding Dudley's observation of Ortiz associating with someone riding a distinctively-colored motorcycle thought to belong to Rodriguez at the storage site, Ortiz's subsequent activity at the storage unit—which they had reason to suspect was connected to Rodriguez—just minutes before the arranged deal, and Ortiz's arrival on the "heels" of Rodriguez at the meet site, all contribute to the officers' valid finding of probable cause. However, even if the Court finds that probable cause to stop and arrest Ortiz at the meet site was lacking, the government argues that the stop was a lawful investigative stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and that the seizure of the heroin occurred during a lawful protective sweep under *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

## III. Discussion

### A. Legal standards

■ Police officers have probable cause to arrest a suspect when " 'the facts and circumstances within their … knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949) (second alteration in original) (quoting *Carroll v.*

*United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). Moreover, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Further, a finding of probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* at 243–44 n. 13, 103 S.Ct. 2317.

■ Importantly, a police officer's finding of probable cause need not be solely based on first-hand knowledge; rather, police officers may have probable cause to stop or arrest someone based on information gleaned from other officers' observations which have been communicated to them. *See, e.g., United States v. Hensley*, 469 U.S. 221, 230–33, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *United States v. Valez*, 796 F.2d 24, 28 (2d Cir.1986) ("The rule [that permits courts to assess probable cause to arrest by looking at the collective knowledge of the police force—instead of simply looking at the knowledge of the arresting officer] exists because, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates."); *United States v. Canieso*, 470 F.2d 1224, 1230 n. 7 (2d Cir.1972); *Williams v. United States*, 308 F.2d 326, 327 (D.C.Cir.1962) ("The whole complex of swift modern communication in a large police department would be a futility if the authority of an individual officer was to be circumscribed by the scope of his first hand knowledge of facts concerning a crime or alleged crime.").

## B. Rodriguez's motion

■ The government contends that Rodriguez does not have standing to contest the admission of the heroin evidence because he has not met his burden of establishing that he had a privacy interest in either the vehicle driven by Ortiz or the storage unit. The government suggests that Rodriguez "misapprehend[s] the constitutional concept of standing. Rodriguez seems to believe that if evidence will be offered at trial, he has standing to object to the search that led to the evidence." Gov't's Surreply at 1 (Paper 25). However, the government mischaracterizes Rodriguez's standing argument. Clearly, Rodriguez has standing to contest the validity of the monitoring of the phone calls that he was a party to. The rest of the evidence Rodriguez seeks to suppress as "fruit of the poisonous tree"—not simply because it is evidence that he believes the government will seek to introduce at trial.

■ The Court agrees with the government, however, that the government's monitoring of the conversations between Spagnola and Rodriguez was lawful and that, therefore, Rodriguez's motion to suppress must be denied. Under 18 U.S.C. § 2511(2)(c), it is not unlawful for a police officer to "intercept" a wire communication where "one of the parties to the communication has given prior consent to such interception." 18 U.S.C.A. § 2511(2)(c) (West 2000). Both Lewis and Spagnola gave uncontroverted testimony that Spagnola was aware of and voluntarily consented to the monitoring of the telephone conversations before they began.

■ Nevertheless, Rodriguez asserts that because Spagnola had been using heroin heavily before his arrest,[12] and was in the process of acute withdrawal during the time that he allegedly consented to the monitoring of the phone calls,[13] his consent could not have been "meaningful." The Court disagrees. Spagnola testified that he was not using heroin at the time that he participated in the phone calls with Rodriguez, nor at any point when he was in jail. Moreover, at the time he placed the May 6th call, Spagnola testified that he had discussed the matter of his cooperation with his attorney and that his free will was not impaired in any way by his prior heroin use. Rather, he said that his cooperation was a "conscious decision." *See* Tr. at 57. Thus, the Court finds that Spagnola's consent was meaningful.

■ The Court also disagrees with Rodriguez that Vermont law should be applied to determine the lawfulness of the government's monitoring of Spagnola's communications with Rodriguez. In *Pforzheimer*, 826 F.2d 200, the Second Circuit held that federal law should be applied to a federal criminal prosecution, even though the underlying investigation leading to the prosecution was conducted solely by state officials, rejecting the argument that such a rule encourages forum shopping. *See id.* at 204. The dicta in *Sotomayor*, suggesting that under certain circumstances, the Second Circuit might apply more stringent state standards to protect a right of priva-

---

**12.** At the time Spagnola was arrested, he had been habitually using two to three bundles of heroin a day for approximately two months, and had used some the morning before his arrest.

**13.** Spagnola testified to his physical withdrawal symptoms from heroin after his arrest in the following way: "It was very hard to sleep, hot and cold flashes, nausea, just basically shaking cold, like cold symptoms. I couldn't sleep and I was nauseous." Tr. at 59–60. His sleeping patterns were abnormal for a "few" weeks, although he thinks he was able to get a full night's sleep after four or five days.

cy and prevent federal forum shopping by the government, *see* 592 F.2d at 1225, is to no avail to Rodriguez. As the government correctly points out, the Second Circuit's later precedents do not require law enforcement officials to comply with state standards before evidence can be admitted in a federal criminal proceeding. *See Workman,* 80 F.3d at 694–95, and cases cited therein. Thus, the Court should apply federal law, under which it has already found that the government's monitoring of the phone calls was lawful. Rodriguez's motion to suppress must be denied.

### C. Ortiz's motion

■ The Court also agrees with the government that the police officers' stop and arrest of Ortiz was supported by probable cause. Although Spagnola admitted that he had never seen or dealt with Ortiz previously, and the officers admitted that they did not know who Ortiz was before the day of the arrests, there was sufficient information collectively available to the officers at the time of the stop and arrest for them to believe that Ortiz was conspiring with Rodriguez to distribute heroin. Given all of the information that police collectively had accumulated—about Rodriguez's residence, motorcycle, and storage unit, combined with Ortiz's two visits to the storage unit, his association with the rider of the motorcycle, the timing of his second visit to the storage unit (minutes after Spagnola and Rodriguez arranged the meeting on the access road),[14] and, espe-

cially, his arrival (in the car seen minutes before at the storage unit) on the heels of Rodriguez at the meet site—there can be little question that police officers had probable cause to suspect that Ortiz was in the process of committing a crime and to arrest him.

■ Because their arrest of Ortiz was lawful, the officers' search of the vehicle incident to that arrest was also lawful. *See New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). In the alternative, the Court finds that for the same reasons described above, the officers had probable cause to suspect that the vehicle driven by Ortiz contained contraband, and therefore, the search of the vehicle was lawful under *Carroll,* 267 U.S. at 149, 45 S.Ct. 280. Having found the contraband, the police then had probable cause to arrest Ortiz. Thus, Ortiz's motion to suppress must be denied.

### III. Conclusion

Wherefore, the Court **DENIES** both Rodriguez's and Ortiz's motions to suppress (Papers 14 and 24).

---

14. Ortiz has argued that the timing of his second visit to the storage unit actually warrants a finding that officers did *not* have probable cause to stop and arrest him, since Lewis testified that Rodriguez's final call to Spagnola was *received* at 2:55 p.m., Dudley testified that he saw Ortiz arrive at the storage site at 3:00 p.m., and the driving distance between Rodriguez's residence and the storage facility is at least ten minutes. This argument does not save Ortiz's motion to suppress, however,

because the 2:55 time that Lewis provided for when Rodriguez's call was received was approximate and because there was no evidence presented that Ortiz was at Rodriguez's residence before making his second visit to the storage unit. It was certainly logical for the police to conclude that, given the timing of the activities and the sequence of events, they had probable cause to believe that Ortiz was involved in the drug activities planned for that day.